DECISION AND JOURNAL ENTRY
{¶ 1} Appellant, State of Ohio ("State") appeals the judgment of the Lorain County Court of Common Pleas which granted a motion to suppress the results of a blood test in favor of Appellee, William Conley ("Conley"). This Court reverses.
 I. {¶ 2} Conley was indicted on May 5, 2007, on one charge of aggravated vehicular homicide in violation of R.C. 2903.06(A)(1)(a), a felony of the second degree; one count of operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(a), a misdemeanor of the first degree; and one count of operating a vehicle under the influence of alcohol in violation of R.C. 4511.19(A)(1)(c), a misdemeanor of the first degree. On May 31, 2007, Conley was arraigned and pleaded not guilty to all of the charges in the indictment.
 {¶ 3} On October 31, 2007, Conley filed a motion to suppress tests of his alcohol level, statements he made in regard to how much he drank the night in question, and observations and *Page 2 
opinions of the police officers who arrested him. The State opposed Conley's motion to suppress, and on April 8, 2008, the trial court denied Conley's motion to suppress.
 {¶ 4} On April 18, 2008, Conley filed a motion for reconsideration of the trial court's ruling on his motion to suppress the results of his blood test. The State opposed Conley's motion. On August 11, 2008, the trial court granted Conley's motion for reconsideration and found: "Upon further consideration of Defendant's motion and additional evidence presented at a further hearing on Defendant's motion to suppress and for reasons set forth on the record, Defendant's motion to suppress is granted." The State timely appeals, setting forth 2 assignments of error. This Court consolidates the State's assignments of error to facilitate review.
 II. ASSIGNMENT OF ERROR I "THE TRIAL COURT ERRED WHEN IT GRANTED APPELLEE'S MOTION TO SUPPRESS AS THE STATE OF OHIO BOTH STRICTLY AND SUBSTANTIALLY COMPLIED WITH OHIO ADMINISTRATIVE CODE SECTION 3701-53-05."
 ASSIGNMENT OF ERROR II "THE SUPPRESSION OF EVIDENCE IN THE INSTANT CASE VIOLATES PUBLIC POLICY AND PRODUCES AN UNJUST RESULT."
 {¶ 5} The State argues that the trial court erred in granting Conley's motion to suppress upon reconsideration because the State, at a minimum, substantially complied with the procedures set forth in Ohio Administrative Code ("OAC") 3701-53-05. This Court agrees.
 {¶ 6} The Supreme Court of Ohio has held that "[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual *Page 3 
questions and evaluate the credibility of witnesses." State v.Burnside, 100 Ohio St.3d 152, 2003-Ohio-5372, at ¶ 8, citing State v.Mills (1992), 62 Ohio St.3d 357, 366. "Because the trial court assumes the role of trier of fact during a suppression hearing and is in the best position to evaluate the credibility of witnesses and resolve questions of fact, a reviewing court must accept the trial court's findings of fact if they are supported by competent, credible evidence." (Internal citations and quotations omitted.) State v. Blair, 9th Dist. No. 24208, 2008-Ohio-6257, at ¶ 4. After accepting the facts as true, reviewing courts must independently determine, under a de novo review and without deference to the trial court's conclusions, whether the facts satisfy the applicable legal standard. Burnside at ¶ 8.
 {¶ 7} In the case at hand, the question is whether the state substantially complied with the strictures set forth in section 3701-53-05 of the OAC for the collection and handling of blood specimens. OAC 3710-53-05 provides:
 "(A) All samples shall be collected in accordance with section 4511.19, or section 1547.11 of the Revised Code, as applicable.
 "(B) When collecting a blood sample, an aqueous solution of a non-volatile antiseptic shall be used on the skin. No alcohols shall be used as a skin antiseptic.
 "(C) Blood shall be drawn with a sterile dry needle into a vacuum container with a solid anticoagulant, or according to the laboratory protocol as written in the laboratory procedure manual based on the type of specimen being tested.
 "* * *
 "(E) Blood and urine containers shall be sealed in a manner such that tampering can be detected and have a label which contains at least the following information:
 (1) Name of suspect;
 (2) Date and time of collection;
 (3) Name or initials of person collecting the sample; and
 (4) Name or initials of person sealing the sample. *Page 4 
 "(F) While not in transit or under examination, all blood and urine specimens shall be refrigerated."
The Supreme Court of Ohio has summarized OAC 3701-53-05, and has held that it "requires the state to (1) use an aqueous solution of a nonvolatile antiseptic on the skin, (2) use a sterile dry needle to draw blood into a vacuum container with a solid anticoagulant, (3) seal the blood container in accordance with the appropriate procedure, and (4) refrigerate the blood specimen when it is not in transit or under examination." Burnside at ¶ 21.
 {¶ 8} The Supreme Court has held that "rigid compliance with the alcohol-testing procedures in the Ohio Administrative Code is not a prerequisite to the admissibility of alcohol-test results." Id. at ¶ 22. The Supreme Court has further specified the procedure for determining the admissibility of alcohol-test results. The first step in challenging the admissibility of such test results is the defendant's filing of a pretrial motion to suppress, challenging the validity of the test. Id. at ¶ 24. After the defendant has filed the requisite pretrial motion, the State then has the burden to show that the alcohol-test in question was administered in substantial compliance with the regulations prescribed by the Director of Health. Id. Finally, once the State has satisfied its burden, a presumption of admissibility is created, and the burden shifts to the defendant to rebut the presumption by showing that he was prejudiced by anything less than strict compliance. Id. Therefore, "evidence of prejudice is relevant only after the state demonstrates substantial compliance with the applicable regulation." Id.
 {¶ 9} In the case before this Court, Heather Rowe ("Rowe"), a clinical nurse at Lorain Community Health Partners ("Hospital"), testified that she was working the night shift in the emergency room on February 18, 2007, when she was asked by Officer Gidich of the Lorain Police Department ("LPD") to draw Conley's blood for the purpose of testing his blood-alcohol level. Rowe testified that she witnessed Officer Gidich administer to Conley the "BMV 2255," *Page 5 
which is a consent form that explains the consequences of taking and not taking the blood test, and that Conley consented to the blood draw. She further testified that had she not been present to hear the reading of the BMV 2255 and to hear the patient's consent, she would not have made the blood draw.
 {¶ 10} Rowe also testified as to the procedure she used when drawing Conley's blood. She testified that she followed the checklist provided by the Lorain County Crime Lab ("LCCL"), but that she did not remember placing red evidence tape over the top of the tube which held Conley's drawn blood. Rowe testified that she did seal the tube in the plastic biohazard bag and then placed the bag and tube into the box in which the blood drawing kit was provided. Rowe testified that she was not sure whether she sealed the box in question with red evidence tape. Finally, Rowe testified that she presented the box containing the tube of Conley's blood to Officer Gidich.
 {¶ 11} Officer Gidich testified that he was involved in the investigation of the two-vehicle collision in which Conley was involved. He further testified that he met the ambulance that was carrying Conley at the hospital because he believed Conley was under the influence and he wanted to obtain a blood test to determine Conley's blood-alcohol level. Officer Gidich testified that he read the complete language of the standard BMV 2255 form to Conley, that Conley appeared to understand what Officer Gidich had read, and that Conley verbally consented to the blood test. Gidich testified that he provided the preassembled blood draw kit from the LCCL to Rowe, that he witnessed Rowe make the blood draw, that he witnessed Rowe initial and write information on the tube, and that he took the sealed biohazard bag and placed it back in the box in which the kit came and sealed it with red evidence tape. Gidich further testified that he did not initial the biohazard bag, but that he did initial the red evidence tape used to seal the *Page 6 
box. Gidich provided that he then turned over the evidence in question to Officer DeAngelis, also of the LPD.
 {¶ 12} Officer DeAngelis, a certified collision reconstructionist for the Lorain Police Department, testified that he received the evidence in question from Officer Gidich at the hospital at around 5:00 a.m., and signed the chain of custody form associated with the evidence. Officer DeAngelis testified that the evidence he took possession of was in the form of a sealed box. Officer DeAngelis testified that after he received the evidence in question, he proceeded to the west substation and waited for Sgt. Pittak in order to transfer the evidence. Officer DeAngelis testified that while he was at the substation, the evidence was locked in the trunk of his police cruiser, and that the outside temperature was approximately 20 degrees. Officer DeAngelis testified that blood evidence was to be kept refrigerated while not in transit, but that he was still in transit while at the substation because the substation had no evidence refrigerator. Finally, Officer DeAngelis testified that he handed the blood evidence to Sgt. Pittak.
 {¶ 13} Sgt. Pittak, also of the LPD, testified that he responded to the scene of the collision in question, processed the scene for about 2 hours, and then proceeded to the substation in order to meet Officer DeAngelis. Sgt. Pittak testified that he believed that the box he received was sealed with red evidence tape when he took possession. He further testified that although the chain of custody form provided that he received the blood evidence at 7:30 a.m., he actually received the evidence around 6:45 a.m. Sgt. Pittak testified that he placed the blood evidence in the evidence refrigerator in the main police station at 7:30 a.m.
 {¶ 14} Sgt. Pittak also testified that he transferred the blood evidence from the main police station to the LCCL and surrendered the blood evidence to Walt Pustulka, a lab technician *Page 7 
at LCCL a few days later. Sgt. Pittak testified that he later obtained the results of the blood test from LCCL.
 {¶ 15} Walt Pustulka ("Pustulka") testified that before he runs any testing on blood samples provided by the LPD, he cross checks the information on the sample with the chain of custody form, as well as inspects the sample in order to detect any tampering. Pustulka testified that once he has determined that there has been a legal blood draw, he begins the process of testing the sample.
 {¶ 16} Pustulka testified that he received the blood sample in question and entered the sample into the LCCL's evidence log. Pustulka also testified that he was the technician that tested the blood sample, that it was inside a box in a sealed biohazard bag, and that he unsealed the biohazard bag and ran the requisite test on the sample. Pustulka testified that the sample yielded a result of .25666 grams percent, which was later explained by the manager of the LCCL to mean "grams by weight per 100 mL of blood."
 {¶ 17} Pustulka testified that the red evidence tape provided in the blood draw kits was to be placed over the top of the tube of blood after the blood draw was completed, but that it was not out of the ordinary for a sample to be sealed in a biohazard bag, placed back in the box, and then the box sealed by the red evidence tape provided. Pustulka could not remember whether the box was sealed when he received it, but stated that he would check the lab, because if it had arrived with red tape it would have been kept. He further testified that there was no red evidence tape over the top of the tube. Lastly, Pustulka provided that he would have known if the biohazard bag had been tampered with by Sgt. Pittak, because there is no way for a biohazard bag to be opened and resealed. *Page 8 
 {¶ 18} Emmanuel DeLeon ("DeLeon"), the manager of the LCCL, testified that he had helped develop the checklist used for alcohol related blood draws. He also testified that it was not a requirement for red tape to be placed over the tube, but that it was merely a recommendation that was not needed in order to be in compliance with the OAC. DeLeon testified that he had in the past received and accepted samples in a tube sealed by red evidence tape, and also in boxes sealed with the red evidence tape. DeLeon also testified that he considered a tube sealed in a biohazard bag to be a tamper-proof instrument.
 {¶ 19} DeLeon provided that he believed a tube must only be in a tamper-proof container to be in compliance with the OAC. DeLeon also testified that he believed that because there were no initials on the biohazard bag, it did not comply with the OAC; however, he testified that he had no reason to disbelieve the testimony of Rowe, and that he believed that the sealed biohazard bag in which the sample in question was presented was a container from which tampering could be detected. Finally, DeLeon testified that a technician would be able to tell if the grey top to the tube had been removed.
 {¶ 20} The trial court found that Rowe drew the blood and placed the tube without the evidence tape into a biohazard bag and sealed it; that the tube in question had Conley's name and social security number, the date the sample was drawn, and Rowe's initials; and that the sealed biohazard bag was placed into the box and sealed with red evidence tape by Officer Gidich. Ultimately, the trial court found that although there had not been strict compliance with the OAC, that the measures taken were sufficient to satisfy the OAC.
 {¶ 21} However, the trial court heard further argument pursuant to Conley's motion to reconsider his motion to suppress after Pustulka could not locate the box in which the blood sample arrived. Pustulka again testified at the reconsideration hearing and provided that he was *Page 9 
unsure if it had arrived in a box because he could not find such a box. Pustulka also testified that a needle could be inserted in the grey top of a tube such as the one at issue and it would be hard to detect the tampering without a magnifying glass. Pustulka further testified that the tube of blood in the case at hand met the standards of the OAC; that sealed biohazard bags meet OAC requirements because they are tamper detectable; and that there was no indication of tampering with the sample.
 {¶ 22} Upon reconsideration, the trial court found "that the sample taken from Mr. Conley on the night in question was not in sufficient compliance with the Administrative Code Section so as to make it admissible into evidence." The trial court made a number of findings of fact. First, the court determined that Rowe was provided with sufficient materials necessary to make a blood draw in accordance with the OAC. However, the court found that she did not follow these instructions when she did not place red evidence tape over the top of Conley's tube of blood drawn from Conley.
 {¶ 23} The trial court also found that there was insufficient proof that the red evidence tape was used on the tube or the outside of the box despite the testimony of the police officers involved. The trial court further found that the biohazard bag which contained the tube of Conley's blood and was received by the LCCL was not unique or individually identifiable. Finally, the trial court found that the tube of Conley's blood was sealed by the grey cap provided, but by no other means, and that the tube contained all of the necessary information required by the OAC.
 {¶ 24} This Court holds that the trial court's findings of fact are indeed supported by competent, credible evidence. Rowe testified that she did not place red evidence tape over the top of the tube, and, therefore, failed to specifically follow the directions as set forth in the *Page 10 
checklist developed by the LCCL. Likewise, the trial court could have found that the testimony provided in regard to the existence of red evidence tape used to seal the box containing Conley's blood sample was not credible. Some witnesses recalled the presence of red evidence tape, while others could not remember whether such tape existed, or whether a box was present at all at the time the sample was delivered to the crime lab. In addition, the trial court's finding that the biohazard bag was not marked or in anyway made uniquely identifiable was supported by the testimony of almost every witness. Finally, there was overwhelming evidence that the tube containing the sample of Conley's blood had the information required by OAC written on the outside of the tube in which it was contained.
 {¶ 25} However, we disagree with the legal conclusions made by the trial court that the State did not show that the blood test was administered in substantial compliance with the OAC. In the case at hand, the State had the burden of showing that the blood test was administered and stored in substantial compliance with the OAC. The State provided the testimony of all of the individuals involved with the blood test from the point when it was drawn, until the point when it was tested. Although the trial court's findings of fact were supported by competent, credible evidence, this Court holds that the trial court erred in finding that the State did not meet its burden of showing substantial compliance with the OAC.
 {¶ 26} The section of 3701-53-05 of the OAC pertinent to the issue now before this Court requires that "blood * * * containers shall be sealed in a manner such that tampering can be detected and have a label which contains" the name of the suspect, the date and time of collection of the sample, the name or initials of the person collecting the sample, and the name or initials of the person sealing the sample. *Page 11 
 {¶ 27} Here, the trial court found that the blood sample in question was placed in a vacuum sealed tube, that it was labeled with the requisite information, and that it was placed in a sealed biohazard bag. However, the trial court found:
 "the bottom line is the bag is not sufficient under the Administrative Code unless it separately identifies the defendant, in this case, Mr. Conley, the person being tested, is not sufficient — the tube itself is not sufficient because the cap can — may not show tampering, even though it's been tampered with. But that the tape would be enough, and, in this case, we don't have the tape on the — we don't have any evidence of the tape whatsoever, much less tape on the tube."
 {¶ 28} The trial court placed great reliance on the fact that Rowe did not follow all of the directions of the LCCL checklist, specifically in failing to place red evidence tape over the top of the tube and failing to separately mark the biohazard bag in which the sample was contained. Although it may be true a blood test would be in compliance with the OAC if every measure in the LCCL checklist was followed, it does not logically follow that a sample is not in compliance if portions of the checklist are not followed. Rather, the checklist was a set of recommendations developed by the LCCL to better insure compliance with the OAC, not a set of requirements absolutely needed for compliance. To better illustrate this point, although Rowe failed to place red evidence tape over the top of the tube containing the blood sample, the manager of the LCCL admitted that such a procedure was a recommendation, and not a requirement to comply with the OAC.
 {¶ 29} Furthermore, OAC 3701-53-05 does not require that extracted blood samples have red evidence tape placed over the top of the tube in which the sample is held, that it be placed in a sealed biohazard bag, or that it be placed in a box sealed with red evidence tape. Rather, OAC 3701-53-05 requires only that the container of blood be "sealed in a manner such that tampering can be detected" and have specific labeling which identifies the sample. In addition, Conley's arguments relating to the absence of red evidence tape, the failure to secure *Page 12 
the blood sample in a box, or the absence of markings on the sealed biohazard bag are in essence "chain of custody" issues instead of issues pertaining to the reliability of the sample.
 {¶ 30} In the case at hand, both the lab technician who tested the blood sample and the manager of the LCCL believed a tube labeled and sealed inside a biohazard bag in a manner identical to the tube in the present case to be in a tamper-proof container. Morever, DeLeon testified that he would still be convinced that the blood sample in question was contained in a tamper-proof container even if the sample was not in a box sealed with red evidence tape.
 {¶ 31} In light of the above, this Court holds that the State fulfilled its burden in showing that the process used to administer the blood test substantially complied with the OAC and, therefore, the trial court erred in finding that the blood sample was not contained in a tamper-proof container. Accordingly, the trial court erred in granting Conley's motion to suppress.
 III. {¶ 32} The judgment of the Lorain County Court of Common Pleas is reversed, and the cause remanded for proceedings consistent with this opinion.
Judgment reversed, and cause remanded.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App. R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the *Page 13 
period for review shall begin to run. App. R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App. R. 30.
Costs taxed to Appellee.
 WHITMORE, J., DICKINSON, P. J. CONCUR. *Page 1