[Cite as *State v. Garner*, 2012-Ohio-1439.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

| STATE OF OHIO | C.A. No. 25771 |
|---|---|
| Appellee | |
| v. | APPEAL FROM JUDGMENT ENTERED IN THE |
| TORRINCE D. GARNER | COURT OF COMMON PLEAS COUNTY OF SUMMIT, OHIO |
| Appellant | CASE No. CR 10 06 1612 |

DECISION AND JOURNAL ENTRY

Dated: March 30, 2012

BELFANCE, Judge.

{¶1} Defendant-Appellant Torrince Garner appeals from his conviction in the Summit County Court of Common Pleas. For the reasons set forth below, we affirm.

I.

{¶2} In June 2010, Mr. Garner was indicted on one count of kidnapping in violation of R.C. 2905.01(A)(3)/(B)(2), a felony of the first degree, and one count of criminal child enticement, in violation of R.C. 2905.05(A)(1), a misdemeanor of the first degree. Prior to the start of trial, the criminal child enticement charge was dismissed upon recommendation of the State. The matter proceeded to a jury trial. At the close of the State's case, Mr. Garner's counsel moved for a judgment of acquittal pursuant to Crim.R. 29. The trial court concluded that the State failed to present sufficient evidence to support a conviction for kidnapping based upon R.C. 2905.01(A)(3), but determined there was sufficient evidence to allow the kidnapping charge

under R.C. 2905.01(B)(2) to go to the jury. The jury found Mr. Garner guilty of kidnapping. The trial court sentenced Mr. Garner to five years in prison.[1]

{¶3} Mr. Garner has appealed, raising three assignments of error for our review.

II.

ASSIGNMENT OF ERROR I

THERE WAS INSUFFICIENT EVIDENCE TO SUPPORT APPELLANT'S CONVICTION.

{¶4} Mr. Garner asserts in his first assignment of error that his conviction was based on insufficient evidence. Specifically, he argues that there was insufficient evidence that Mr. Garner restrained the victim's liberty under circumstances that created a substantial risk of serious physical harm to the victim.

{¶5} In determining whether the evidence presented was sufficient to sustain a conviction, this Court reviews the evidence in the light most favorable to the prosecution. *State v. Jenks,* 61 Ohio St.3d 259, 274 (1991). Furthermore:

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus.

{¶6} R.C. 2905.01(B)(2) states that:

> [n]o person, * * * in the case of a victim under the age of thirteen or mentally incompetent, by any means, shall knowingly * * * *under circumstances that*

---

[1] We note that the sentencing entry states that Mr. Garner was found guilty of violating R.C. 2905.01(A)(3). Given that the trial court dismissed this portion of count one pursuant to Crim.R. 29 and only instructed the jury pursuant to R.C. 2905.01(B)(2), this appears to be a typographical error that the trial court could correct via nunc pro tunc entry.

*either create a substantial risk of serious physical harm to the victim* or cause physical harm to the victim: * * * (2) [r]estrain another of the other person's liberty.

(Emphasis added.)   We note that Appellant has not argued that there was no evidence of restraint, nor has asserted that the restraint only occurred during a narrow portion of his encounter with the victim.  "'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist."  R.C. 2901.01(A)(8).

{¶7}    "Serious physical harm to persons" means any of the following:

Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment;

Any physical harm that carries a substantial risk of death;

Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;

Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement;

Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.

R.C. 2901.01(A)(5).    "'Physical harm to persons' means any injury, illness, or other physiological impairment, regardless of its gravity or duration."  R.C. 2901.01(A)(3).  "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  R.C. 2901.22(B).

{¶8}    Mr. Garner's conviction for kidnapping stems from a series of events that took place on June 7, 2010, in and near the rooming house where Mr. Garner was living.  The rooming house contained four bedrooms, and it appears from the record that four other people besides Mr. Garner lived there.  The testimony indicated that people moved in and out of the

residence frequently. For example, one witness who lived there at the time testified that, "I'm not sure who was staying there at the time. I get new roommates almost every month." In order to keep their personal possessions secure, residents padlocked their bedrooms. At the time of the incident, at least two of the residents had prior felony convictions, one of which was for trafficking in cocaine.

{¶9} The victim in the instant matter, nine-year-old D.A.S., lived a couple houses away from the rooming house where Mr. Garner lived. That afternoon, D.A.S. left her home to meet her two cousins at the corner of her street. Mr. Garner's home is on that corner. D.A.S. testified that Mr. Garner stopped her and asked if she would agree to "act like [his] daughter" for $5. D.A.S agreed, and Mr. Garner showed her into the house and directed her into the basement. D.A.S. testified that she became afraid and was concerned that she would never see her family again. D.A.S.' cousins saw her go into the house with Mr. Garner and hurried home to tell D.A.S.' parents. D.A.S.' parents and some of her siblings ran to the house.

{¶10} While there was a kitchen shared by the residents in the basement, Mr. Garner took D.A.S. into the bedroom of Eugene Washington, one of the other tenants. Mr. Washington noticed someone going into the basement and headed down there to make sure his door was locked. He found Mr. Garner in his room with a little girl. He thought that maybe the little girl was one of his other roommates' granddaughters. Mr. Washington was shocked to see them in his room and told them to get out.

{¶11} D.A.S.' father got to the house first and began knocking on the front door. No one answered. D.A.S.' father began walking around the house looking in the windows. At this point, Mr. Garner heard knocking at the door and went upstairs. He told D.A.S. to stay in the basement. D.A.S.' brother went to the side door, encountered Mr. Garner and began asking him

where his sister was. D.A.S.' father heard this exchange and heard Mr. Garner tell D.A.S.' brother that D.A.S. was not in the house. D.A.S.' father came to the side door and again asked Mr. Garner where D.A.S. was. Mr. Garner again said that she was not there. D.A.S.' father did not believe him because Mr. Garner would not look D.A.S.' father in the eyes. D.A.S.' father began choking Mr. Garner and yelling D.A.S.' name. D.A.S. heard her father yelling and came running up from the basement. She ran past Mr. Garner and her father and ran towards home. D.A.S.' father testified that D.A.S. appeared to be scared. D.A.S.'s father testified that Mr. Garner proceeded to leave the immediate area on foot, as did a woman Mr. Garner was with. In the meantime, members of D.A.S' family had called 911 and they followed Mr. Garner, waiting for police to arrive. When law enforcement arrived, Mr. Garner told the police that he had been talking to D.A.S. outside the house about boxing, but he did not know how she got into the house.

{¶12} Mr. Garner asserts on appeal that his *conduct* did not create a substantial risk of serious physical harm to D.A.S. nor did he cause physical harm to D.A.S. as required by R.C. 2905.01(B)(2). Neither party asserts that D.A.S. suffered physical harm from the incident, nor does the record reveal any evidence that would support such a conclusion. Thus, our focus is on the first part of Mr. Garner's argument.

{¶13} We initially note that Mr. Garner misreads the statute. The statute does not require that Mr. Garner's *conduct* created a substantial risk of serious physical harm to D.A.S.; instead the statute requires that *the circumstances* under which Mr. Garner restrained D.A.S.' liberty created a substantial risk of serious physical harm to her. *See* R.C. 2905.01(B)(2).

{¶14} The circumstances, when viewed in a light most favorable to the State, reveal a troubling picture, particularly given the young, tender age of the victim. Mr. Garner lured nine-

year-old D.A.S. into the basement bedroom of a rooming house by promising to pay her $5 to pretend to be his daughter. The rooming house was occupied by mostly adult men who were strangers to D.A.S., some of whom had felony records. There was testimony that Mr. Garner had been drinking that day and that Mr. Garner's girlfriend had been using marijuana. Mr. Garner did not take D.A.S. into a common area, or even his own quarters on the first floor; instead, Mr. Garner took D.A.S. into the basement into another tenant's bedroom. Moreover, when Mr. Garner went to answer the door, he told D.A.S. to stay in the basement, leaving her vulnerable to other strangers and lied to her family, telling them that she was not in the house. Finally, there is testimony from Mr. Garner's girlfriend, that Mr. Garner called her from prison and told her to leave the rooming house because he was concerned that one of the tenants would "take advantage" of Mr. Garner's girlfriend and/or steal from her.

{¶15} While these particular circumstances might not create a substantial risk of serious physical harm to an adult, the victim in this case was only nine years old. Given Mr. Garner's strange request to D.A.S., his use of money to bring her into his residence, accompanied by his command to stay in the basement along with lies to her family about her whereabouts, Mr. Garner's motivations for spending time alone with D.A.S., when viewed in a light most favorable to the prosecution, creates an inference that D.A.S. was restrained under circumstances that created a substantial risk of serious physical harm. Moreover, Mr. Garner brought D.A.S. into surroundings that were far from a safe place for a child, particularly given the variety of adults with criminal backgrounds in the home, and the admitted drug and alcohol use that took place there. Finally, we note that D.A.S' liberty was restrained in an environment that Mr. Garner did not even feel was safe for his girlfriend. While this case presents a close call, we nonetheless conclude that sufficient evidence was presented whereby a reasonable trier of fact

could find that the totality of the circumstances under which Mr. Garner restrained D.A.S.' liberty did create a substantial risk of serious physical harm to her. *See State v. Vinson*, 5th Dist. No. 2003CA00132, 2004-Ohio-1568, ¶ 27-28; *State v. Graves*, 1st Dist. No. C-940980, 1995 WL 610700, *2 (Oct. 18, 1995). Accordingly, we overrule Mr. Garner's first assignment of error.

## ASSIGNMENT OF ERROR II

APPELLANT'S CONVICTION WAS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶16} Mr. Garner asserts in his second assignment of error that his conviction for kidnapping was against the manifest weight of the evidence.

{¶17} In reviewing a challenge to the weight of the evidence, the appellate court:

"[m]ust review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."

*State v. Thomas,* 9th Dist. Nos. 22990, 22991, 2006–Ohio–4241, ¶ 7, quoting *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). "[T]his Court's 'discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.'" *Thomas* at ¶ 8, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶18} Mr. Garner has failed to develop this argument. *See* App.R. 16(A)(7). Essentially, Mr. Garner's argument is a restatement of the argument he made in his first assignment of error. After having reviewed the entire record, we likewise cannot say the jury was unreasonable in concluding that the circumstances under which Mr. Garner restrained D.A.S. subjected her to a substantial risk of serious physical harm.

{¶19} Moreover, while Mr. Garner presented witnesses who called into question D.A.S.' credibility and presented an alternate theory of the case, i.e. that D.A.S. snuck into the house on her own and no one knew she was there, we cannot say that the jury's credibility determinations were unreasonable. *See State v. Andrews,* 9th Dist. No. 25114, 2010-Ohio-6126, ¶ 28. There was testimony that D.A.S' cousins saw D.A.S. go into the house with Mr. Garner and further testimony that another resident saw Mr. Garner with a little girl in the house. Moreover, the jury could have found at least some of Mr. Garner's witnesses not credible. For example, one of the witnesses was Mr. Garner's girlfriend, whom the jury could have believed was motivated to be untruthful in order to help Mr. Garner. Thus, after a thorough review of the record, we cannot say the jury lost its way in finding Mr. Garner guilty of kidnapping. Mr. Garner's second assignment of error is overruled.

## ASSIGNMENT OF ERROR THREE

THE COURT ERRED IN FAILING TO INSTRUCT THE JURY ON THE MORE SPECIFIC, LESSER INCLUDED CHARGE OF CRIMINAL CHILD ENTICEMENT.

{¶20} Mr. Garner argues in his third assignment of error that the trial court committed plain error in failing to instruct the jury on criminal child enticement as a lesser included offense of kidnapping. As Mr. Garner failed to object to the absence of such an instruction, he asserts the trial court's failure amounts to plain error. *See* Crim.R. 30(A).

{¶21} To establish plain error,

"[f]irst, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights * * * ' [to the extent that it] * * * affected the outcome of the trial."

*State v. Hardges,* 9th Dist. No. 24175, 2008-Ohio-5567, ¶ 9, quoting *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

**{¶22}** This Court has previously stated that:

[w]hile a trial court does have a duty to include instructions on lesser included offenses, a defendant still retains the right, through counsel, to waive such instructions. Given this right to waive jury instructions on lesser-included offenses, plain error does not lie where trial counsel failed to request jury instructions on lesser included offenses as a matter of trial strategy.

(Internal citations and quotations omitted.) *State v. Pigg*, 9th Dist. No. 24360, 2009-Ohio-2107, ¶ 5.

**{¶23}** Nonetheless, even assuming that the failure to request the instruction was not trial strategy in this instance, we cannot say the trial court committed plain error. The Supreme Court of Ohio held in *State v. Deem*, 40 Ohio St.3d 205 (1988), paragraph three of the syllabus, that:

[a]n offense may be a lesser included offense of another if (i) the offense carries a lesser penalty than the other; (ii) the greater offense cannot, as statutorily defined, ever be committed without the lesser offense, as statutorily defined, also being committed; and (iii) some element of the greater offense is not required to prove the commission of the lesser offense.

Subsequently in *State v. Smith*, 117 Ohio St.3d 447, 2008-Ohio-1260, paragraph one of the syllabus, the Supreme Court modified the test in *Deem* and stated that "[i]n determining whether an offense is a lesser included offense of another when a statute sets forth mutually exclusive ways of committing the greater offense, a court is required to apply the second part of the [*Deem* test], to each alternative method of committing the greater offense."

**{¶24}** We note that Mr. Garner has not cited to any case law concluding that criminal child enticement as stated in R.C. 2905.05(A) is a lesser included offense of kidnapping as stated in R.C. 2905.01(B)(2), nor could this Court locate any. Moreover, it appears to this Court from a cursory review of the statutes that kidnapping could be committed without committing criminal

child enticement. Accordingly, we fail to see how the trial court committed an obvious error by failing to give the instruction when it is not even apparent that criminal child enticement is a lesser included offense of kidnapping. Accordingly, we overrule Mr. Garner's third assignment of error.

III.

{¶25} In light of the foregoing, we affirm the judgment of the Summit County Court of Common Pleas.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

———————————

EVE V. BELFANCE
FOR THE COURT

MOORE, P. J.
CONCURS

DICKINSON, J.
DISSENTING.

{¶26} Although Torrince Garner's request to D.A.S. was creepy and suspicious, the State failed to prove that he restrained her under circumstances that posed a substantial risk of serious physical harm to her. I, therefore, dissent.

{¶27} The Grand Jury indicted Mr. Garner for violating Section 2905.01(A)(3) or 2905.01(B)(2) of the Ohio Revised Code by kidnapping D.A.S. At the conclusion of the State's case, Mr. Garner moved for judgment of acquittal under Rule 29 of the Ohio Rules of Criminal Procedure. The trial court granted Mr. Garner's motion to the extent he was alleged to have violated Section 2905.01(A)(3). Regarding Section 2905.01(B)(2), Mr. Garner argued that there was no evidence of restraint. In response, the State argued that there was testimony that he "removed [D.A.S.] from the place where she [was] found" by luring her to his house for money. The court noted that, if the State wanted to proceed under a theory of removal, it would have to amend the indictment because "remov[al] . . . from the place where the other person is found" is an offense under Section 2905.01(B)(1), not Section 2905.01(B)(2).

{¶28} The State moved to amend the indictment, and the trial court granted its motion. Despite the amendment to include a charge under Section 2905.01(B)(1), the court only gave the jury an instruction regarding restraint under Section 2905.01(B)(2). Accordingly, in determining whether Mr. Garner's conviction is supported by sufficient evidence, it is only proper to consider whether the circumstances posed a substantial risk of serious physical harm to D.A.S. during the

time that he restrained her, as opposed to the entire time that he removed her from the place where he found her.

{¶29} According to D.A.S., after Mr. Garner offered her the five dollars, she went with him to the basement of a house. He did not say anything to her while they walked to the basement. After they got to the basement, she saw another man, but could not remember whether he said anything to them. She then heard banging on an upstairs door, whereupon Mr. Garner told her to "stay right there . . . [i]n the back [of the basement]." D.A.S. testified that Mr. Garner pointed while he instructed her to stay in a regular tone of voice. She also testified that the place where Mr. Garner told her to stay was at the bottom of a staircase.

{¶30} According to Eugene Washington, he was the other man that D.A.S. saw in the basement. He testified that he was on the first floor of the house watching television when he saw Mr. Garner go downstairs with a little girl and that he went downstairs after them to make sure he had locked the door to his room. When he got downstairs, he saw Mr. Garner standing in the entryway of his (Mr. Washington's) room and the girl inside the room. According to Mr. Washington, he told Mr. Garner and the girl to get out and went into his room, where he stayed until he heard a commotion.

{¶31} Courts have held that "[a] person's liberty is restrained when the offender limits the victim's freedom of movement in any fashion for any period of time." *State v. Butcher*, 11th Dist. No. 2011-P-0012, 2012-Ohio-868, at ¶ 71; *see also State v. Martin*, 10th Dist. Nos. 02AP33, 02AP34, 2002-Ohio-4769, at ¶ 32. Under the facts of this case, the only time that Mr. Garner limited D.A.S.'s movement was when he told her to stay in the basement while he went upstairs to answer the door. The question in this case, therefore, is whether Mr. Garner's leaving

nine-year-old D.A.S. at the bottom of the basement staircase while he answered the door presented a substantial risk of serious physical harm to her.

{¶32} "Serious physical harm" is defined in the Ohio Revised Code as "(a) Any mental illness or condition of such gravity as would normally require hospitalization or prolonged psychiatric treatment; (b) Any physical harm that carries a substantial risk of death; (c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity; (d) Any physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement; [or] (e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5). "'Substantial risk' means a strong possibility, as contrasted with a remote or significant possibility, that a certain result may occur or that certain circumstances may exist." R.C. 2901.01(A)(8).

{¶33} Other kidnapping cases analyzing whether circumstances presented a substantial risk of serious physical harm to the victim do not at all resemble the facts of this case. Rather, the closest case comparisons involve the offense of child endangerment under Section 2919.22(A). Under that section, "[n]o person . . . having custody or control . . . of a child under eighteen years of age . . . shall create a substantial risk to the health or safety of the child . . . ." R.C. 2919.22(A).

{¶34} In *State v. Hughes*, 3d Dist. No. 17-09-02, 2009-Ohio-4115, a father left his five-year-old daughter inside a truck in a Wal-Mart parking lot for 27 minutes. He left the vehicle running with the keys in the ignition, and his daughter knew how to open the doors of the truck herself. The State argued that the circumstances presented a substantial risk to the girl's safety because she could have exited the vehicle and been injured in the parking lot, she could have

been kidnapped if she had exited the vehicle or opened the door for a stranger, or she could have placed the vehicle in drive and struck someone or something else. The Third District Court of Appeals rejected the State's arguments, noting that each of the scenarios "requires multiple contingencies to occur and several inferences to be made before the actual harm is brought to fruition." *Id*. at ¶ 23. The court explained that, "[i]n determining whether a substantial risk to the health or safety of the child exists, the trial court is not permitted to 'make an inference upon an inference in order to transform a speculative risk into a substantial risk. To prove the requisite 'substantial risk' element, . . . there must be some evidence beyond mere speculation as to the risk of harm that could potentially occur due to a single imprudent act.'" *Id*. at ¶ 21 (quoting *Middletown v. McWhorter*, 12th Dist. No. CA2006-03-068, 2006-Ohio-7030, ¶ 11).

{¶35} In *State v. Allen*, 140 Ohio App. 3d 322 (1st Dist. 2000), a father left his seven-year-old son home alone for 20 minutes while he left "to see a woman." *Id*. at 324. The First District Court of Appeals determined that, even though the State had speculated about things that might have occurred that could have injured the child, "such speculation failed to demonstrate beyond a reasonable doubt that there was a strong possibility that [the child] would have been injured." *Id*. at 325.

{¶36} In *State v. Boone*, 1st Dist. No. C-950427, 1996 WL 454813 (Aug. 14, 1996), a mother left her seven-year-old son in a K-mart parking lot for fifteen minutes after he threw a tantrum. The First District Court of Appeals wrote that, "[w]hile we may not agree with appellant's method of disciplining her child, we hold that her actions, as a matter of law, did not create a *substantial risk* to the child's health or safety. We recognize that appellant's behavior may have caused some speculative risk to her child; however, we hold that her conduct did not,

under the circumstances of this case, create a *strong possibility* that her child would be harmed." *Id.* at *1.

{¶37} In *State v. McLeod*, 165 Ohio App. 3d 434, 2006-Ohio-579 (2d Dist.), a babysitter let a five-year-old girl play by herself at an apartment complex playground that was 125 to 150 yards from the complex. Although the babysitter could see the playground from his apartment, his view was partially obstructed by brush. The Second District Court of Appeals concluded that, despite testimony that the playground had been a problem area for police with a history of juvenile assault activity, there was not a strong possibility that the girl would not be safe at the playground. *Id.* at ¶ 13. The Court also explained that it did "not share the state's view that an actor . . . creates a substantial risk to a five-year-old merely by allowing the child out of his or her direct line of sight for a brief period." *Id.* at ¶ 14.

{¶38} The State has argued that the circumstances placed D.A.S. in substantial risk of serious harm because Mr. Garner lured her to the basement, because she was seen inside one of the bedrooms in the basement, because she was told to remain in the basement while he went upstairs to answer the door, because she was scared, and because Mr. Garner told D.A.S.'s parents that she was not inside the house. As explained earlier, the analysis must be limited to the circumstances that existed at the time D.A.S. was restrained. The reason that she was in the basement and what Mr. Garner told D.A.S.'s parents is not relevant to whether the circumstances posed a substantial risk of serious physical harm to her during the restraint.

{¶39} The majority has concluded that the surroundings were unsafe for D.A.S. given the "variety of adults with criminal backgrounds in the home, and the admitted drug and alcohol use that took place there." Although some of the residents of the house had criminal records, the offenses were for theft and drug use, not any sort of violent or sexual crimes that might have

resulted in serious physical harm to D.A.S. In addition, there was no testimony that there was drug or alcohol use going on in the basement at the time D.A.S. was present.

{¶40} The majority has also concluded that Mr. Garner's telephone conversations demonstrate that he did not even feel the environment was safe for his girlfriend, who was an adult. Although Mr. Garner expressed concern that a roommate named "James" might try to "take advantage of" his girlfriend, there was no evidence that James was in the house, let alone the basement, at the time Mr. Garner left D.A.S. alone in the basement. Moreover, even construing Mr. Garner's "take advantage of" statement to imply that James would attempt sexual conduct with the girlfriend, there was no evidence that the roommate would be inclined to molest a child as opposed to seduce a grown woman.

{¶41} According to Mr. Washington, it was a mere thirty seconds between the time he told Mr. Garner and D.A.S. to exit his room to when he heard a commotion coming from upstairs, which, we can infer from the other evidence, was Mr. Garner's scuffle with D.A.S.'s father. There was a remote possibility that someone could have attacked D.A.S. and caused serious physical harm to her as she stood in the basement for a minute or two while Mr. Garner answered the door. Under the totality of the circumstances, however, that possibility is well short of the "strong possibility" needed to find a "substantial risk" under Section 2905.01(B)(2). I would, therefore, hold that there was insufficient evidence to convict Mr. Garner of kidnapping under Section 2905.01(B)(2).

APPEARANCES:

JEFFREY N. JAMES, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and HEAVEN DIMARTINO, Assistant Prosecuting Attorney, for Appellee.