[Cite as *State v. Griffin*, 2013-Ohio-416.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| STATE OF OHIO | | C.A. No. 11CA010128 |
|---|---|---|
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| PATRICK GRIFFIN | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE No. 10CR080110 |

DECISION AND JOURNAL ENTRY

Dated: February 11, 2013

WHITMORE, Judge.

{¶1} Defendant-Appellant, Patrick Griffin, appeals from his convictions in the Lorain County Court of Common Pleas. This Court affirms.

I

{¶2} On the morning of November 26, 2009, the police discovered the body of Alberto "Cookie" Gutierrez in a ditch on Pratt Road in Lorain County. The police soon identified Griffin as a person of interest. Griffin lived across the hall from Cookie in the same apartment complex and his cell phone number was the last number dialed on Cookie's cell phone. Through further investigation, the police discovered that Griffin lied about his whereabouts around the time of the murder and that his cell phone and car were in the approximate vicinity of the murder scene near Cookie's estimated time of death. Forensic testing also later uncovered gunshot residue on a glove in Griffin's car as well as primer residue in his car and on the cuff of his jacket.

**{¶3}** A grand jury indicted Griffin on counts of aggravated murder, murder, felony murder, felonious assault, and having weapons under disability. All of the counts also contained an attendant firearm specification, and four of the counts contained repeat violent offender specifications. Griffin filed a motion to suppress certain cell phone records that the State obtained to triangulate the position of his cell phone during and around the time of the murder, but the trial court denied his motion. Subsequently, the matter proceeded to a jury trial, and the jury found Griffin guilty on all counts. The trial court then sentenced Griffin to life in prison.

**{¶4}** Griffin now appeals and raises five assignments of error for our review. For ease of analysis, we rearrange the assignments of error.

II

Assignment of Error Number Three

THE TRIAL COURT ERRED IN DENYING MR. GRIFFIN'S MOTION TO SUPPRESS EVIDENCE SEIZED FROM HIS CELLULAR PHONE.

**{¶5}** In his third assignment of error, Griffin argues that the trial court erred by denying his motion to suppress. We disagree.

**{¶6}** The Ohio Supreme Court has held that:

[a]ppellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. *State v. Mills*, 62 Ohio St.3d 357, 366 (1992). Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Fanning*, 1 Ohio St.3d 19 (1982). Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard. *State v. McNamara*, 124 Ohio App.3d 706 (4th Dist.1997).

*State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, ¶ 8. *Accord State v. Hobbs*, 133 Ohio St.3d 43, 2012-Ohio-3886, ¶ 6 (*Burnside* applied). Accordingly, this Court reviews the trial

court's factual findings for competent, credible evidence and considers the court's legal conclusions de novo. *State v. Conley*, 9th Dist. No. 08CA009454, 2009-Ohio-910, ¶ 6, citing *Burnside* at ¶ 8.

{¶7} Griffin sought to suppress certain information the State obtained about his cell phone usage. Specifically, the State subpoenaed records from his cell phone provider that listed all of the incoming and outgoing calls the phone had made and received around the time of the murder. The records also contained information about the location of the cell phone at the time those calls were made or received, as the provider recorded the particular cell phone tower and side of the tower that the signal for any given call reached to complete the call. Griffin argues that the trial court erred by denying his motion to suppress because the State was required to obtain a warrant for his cell phone records. He relies upon *State v. Smith*, 124 Ohio St.3d 163, 2009-Ohio-6426.

{¶8} In *Smith*, the Ohio Supreme Court held that the Fourth Amendment prohibits the warrantless search of data within a cell phone when the phone is seized incident to a lawful arrest and no separate exigent circumstances exist. *Smith* at syllabus. There, officers searched the call records and phone numbers on the defendant's phone at some point after his arrest. The issue before the court, therefore, was "whether the police may search data *within an arrestee's cell phone* without a warrant." (Emphasis added.) *Id.* at ¶ 13.

{¶9} Unlike the officers in *Smith*, the officers in this case did not search within Griffin's cell phone to obtain the information about his call records. Instead, the officers subpoenaed Griffin's cell phone provider for that information. *Smith* is wholly distinguishable and does not support Griffin's argument that the police were required to secure a warrant before subpoenaing his call records. *See State v. Neely*, 2d Dist. No. 24317, 2012-Ohio-212, ¶ 13-27

(warrant not required when the police subpoena cell phone records from defendant's provider). The trial court correctly concluded that *Smith* does not apply.

{¶10} The trial court determined that the State properly subpoenaed Griffin's cell phone records from his provider by way of 18 U.S.C. 2703. That statute "establishes a procedure that a governmental entity is to follow in obtaining records pertaining to a subscriber to, or customer of, an electronic communication service." *Id.* at ¶ 15. Griffin does not discuss 18 U.S.C. 2703 in his argument or suggest that the State failed to properly subpoena his records. His only argument is that, per *Smith*, the State was required to obtain a warrant before it could search his cell phone records. As previously discussed, *Smith* only applies to situations where the police actually search within a defendant's cell phone to obtain its call records. The police did not do so here; they relied upon 18 U.S.C. 2703. Moreover, we need not analyze whether the State properly subpoenaed Griffin's records through 18 U.S.C. 2703, as Griffin has not addressed that procedure on appeal. *See* App.R. 16(A)(7). The trial court did not err by denying Griffin's motion to suppress. As such, Griffin's third assignment of error is overruled.

Assignment of Error Number Two

> MR. GRIFFIN'S CONVICTIONS ARE AGAINST THE MANIFEST WEIGHT
> OF THE EVIDENCE.

{¶11} In his second assignment of error, Griffin argues that his convictions are against the manifest weight of the evidence. We disagree.

{¶12} In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *See also Otten* at 340.

{¶13} Griffin argues that the jury lost its way by convicting him because the case against him was highly circumstantial and no one was able to place him with Cookie at the time the murder occurred. Griffin does not challenge the credibility of any particular witness or piece of evidence. Instead, he simply argues that the evidence weighs heavily against his conviction.

{¶14} Mariano Gutierrez, Cookie's father, testified that Cookie agreed to live with him in his apartment and help take care of him after he had to have his leg amputated. The apartment was located across the hall from an apartment occupied by Griffin, his wife, and her two children. Benvenita Dominguez, Cookie's niece and Gutierrez' granddaughter, testified that Cookie sometimes socialized with Griffin. He also detailed Griffin's car. John Dalton, a friend of Cookie's, testified that Cookie once introduced him to Griffin and described Griffin as "a good dude" who allowed Cookie to borrow his car.

{¶15} Ronaye Ewing, Griffin's wife, testified that the door to the apartment she and Griffin shared "was kicked in" on November 25, 2009, the day before Thanksgiving. Although Ewing did not notice anything missing from the apartment, she testified that their X-box had

been thrown to the floor and a cabinet was open. The same day, Griffin approached another tenant regarding the break in. Aubry Brown testified that Griffin confronted her with a revolver and demanded to know who had broken into his home. Brown testified that Griffin was angry and pointed the gun at her during their conversation. She further testified that Griffin had the handle of the gun wrapped in a clear bag as if he was trying to avoid leaving fingerprints on the gun. According to Brown, when she told Griffin that she did not know anything about the break in, he left her alone and said he would find out who was responsible.

{¶16} Dalton testified that he picked up Cookie at his apartment building around 7:30 p.m. the night of the 25th and brought Cookie to his house for a small party. Dominguez was in the apartment building visiting her aunt and went to check on her grandfather after Cookie left. Dominguez testified that she saw Griffin walking into his apartment as she left her aunt's apartment. She further testified that Griffin came back out into the hallway and asked her if Cookie was there at the apartment. When Dominguez told Griffin that Cookie was not there, he went back into his apartment and closed the door.

{¶17} Cookie remained with Dalton and his family for the rest of the evening. Dominguez testified that she spoke with Cookie around 11:30 p.m. because he called to give her a recipe. At some point close to 1:00 a.m. on Thanksgiving Day, Dalton testified, he dropped off Cookie at his apartment. Nicole Booth, another tenant, was outside her apartment smoking at the time and spoke with Cookie for a few minutes when he arrived. Booth testified that after Cookie spoke with her she saw him walk to Griffin's door, knock, and go inside. Booth never saw who opened the door and returned to her apartment shortly thereafter. Gutierrez testified that he stayed up until approximately 3:30 a.m. on Thanksgiving Day waiting for his son to arrive, but Cookie never came back.

{¶18}  At about 7:30 a.m. on Thanksgiving Day, Larry Eishen spotted a body lying in the ditch alongside Pratt Road and called 911.  The police found a wallet and cell phone on the body and soon identified the body as Cookie's.  Dr. Paul Matus, the Lorain County Coroner at the time of Cookie's death, testified that Cookie died as a result of two gunshot wounds to his abdomen and estimated that his approximate time of death was 2:30 a.m.  Dr. Matus further testified that one of the gunshots Cookie sustained had struck the zipper of his jacket and had knocked out some of its teeth.

{¶19}  Detective Anthony Kovacs testified that he examined Cookie's cell phone and determined that the last number he had dialed was a cell phone number that the police later traced to Ewing and Griffin.  Detective Kovacs drove to Cookie's apartment building later in the day to assist with the death notification.  At that time, the police showed Dominguez pictures of Ewing and Griffin, and she identified them as Cookie's neighbors.  She also gave the police a description of their cars.  Detective Kovacs found Griffin's car, an old, maroon Cadillac, parked in the back of the apartment building.  Upon inspecting the car from the outside, Detective Kovacs observed long grass on the driver's side floorboard, which he believed was the same type of grass that he had observed at the murder scene.  The police ultimately towed Griffin's car and obtained a warrant before searching it.  The search uncovered a glove on the driver's seat, more grass on the floor, and a very small piece of metal on the front passenger floor mat.  The car was also swabbed for gunshot residue.

{¶20}  Detective Michael Lopez testified that he spoke with Griffin directly after the police delivered the death notification to Cookie's family.  Detective Lopez testified that Griffin hesitated when answering questions.  Griffin claimed that the last time he saw Cookie was sometime around 3:00 p.m. the day before (November 25th).  He denied speaking with Cookie

on the phone at some point later and denied having left the apartment the previous night. Later in the same conversation, however, Griffin changed his answer and indicated that Cookie had called him at about 1:00 a.m. that morning (November 26th) and asked him to come out for a drink. According to Detective Lopez, Griffin appeared very nervous when the police finally told him that they had found Cookie and he was dead. Detective Lopez testified that he specifically asked Griffin about his car and Griffin stated that he had not used the car to give Cookie a ride and had not gone anywhere during the late evening hours of November 25th or the early morning hours of November 26th.

{¶21} During their investigation, the police obtained Griffin's cell phone records and also conducted a search to determine whether any officer had run Griffin's license plate number through LEADS around the time of the murder. There was testimony that Ewing was listed as the subscriber of three different cell phone lines, but Ewing clarified that she only used one of the phones and Griffin and one of her children used the other two. Ewing confirmed that Griffin used the cell phone number that appeared on Cookie's cell phone as the last number dialed.

{¶22} Officer Christine Roberts testified that she performed a cell phone and cell tower analysis of Griffin's cell phone line using the cell phone records the police subpoenaed from the phone's provider. Officer Roberts explained that cell phones transmit a radio frequency and connect to a particular cell tower each time an outgoing call is made or an incoming call is received. In addition to logging all the calls made and received on a cell phone, Officer Roberts testified, cell phone providers also code each call by the particular tower used to transmit the call. She explained that cell phone towers all generally have three sides with one side oriented to the north. When a cell phone signal connects to a tower, it only connects to one of the three sides of the tower. The signal then remains connected to that side of the tower unless the cell

phone is moved or the call terminates. If the phone is moved outside the range of the tower itself or a particular side of the tower, the phone's signal will then connect to a different tower or different side of the same tower. Officer Roberts testified that the provider of Griffin's cell phone included in the coding for each outgoing and incoming call the particular tower and side of the tower the phone's signal connected with at the point each call was initiated and at the point each call was terminated. Using that information, Officer Roberts was able to plot any movement of Griffin's cell phone during the time in question and approximate its position. Officer Roberts explained that she was only able to approximate position because the range of any given tower varies. Accordingly, Officer Roberts could narrow the cell phone to being located anywhere within the range of a particular side of a particular tower, but not precisely where the phone was within that range.

{¶23} Officer Roberts testified that eight calls were logged on Griffin's cell phone between 12:09 a.m. and 12:51 a.m. on November 26, 2009 (Thanksgiving Day). Each of the eight calls connected to Griffin's home cell tower; the tower that Officer Roberts identified as the one that would be used to connect any calls Griffin made or received while at his apartment. Officer Roberts testified that another call at 1:14 a.m. connected to a different tower that was southeast of Griffin's home tower, meaning that someone had taken the phone southeast at that point. The phone continued to move south and, at 1:47 a.m., connected to a tower in Wellington whose range covered the area of Pratt Road where Cookie's body was found. Subsequently, another call at 2:15 a.m. showed that the cell phone was moving back north. The phone continued to travel north, connecting with a tower north of the murder scene at 2:25 a.m. and different sides of another tower at 2:31 a.m., 2:38 a.m., and 2:48 a.m. Finally, Officer Roberts testified, the phone's signal connected to the home tower again at 3:35 a.m. She further testified

that the phone traveled again the following morning, connecting with towers headed southeast of Wellington before eventually returning to Griffin's home tower.

{¶24} Ewing testified that she remained at the apartment the night of November 25th through the following morning. She testified that she slept on the apartment's couch and faded in and out as the night went on because she had taken Vicodin to cope with pain she felt from a recent surgery. According to Ewing, Griffin kept walking in and out of the apartment while she slept. Griffin was not there, however, at one point when Ewing awoke, so she called his cell phone. Ewing agreed based on the cell phone records that she had called Griffin at 1:14 a.m. on November 26th. When she was unable to get a hold of Griffin, Ewing went back to sleep. She woke up at some point later and discovered that Griffin was home. Ewing also testified that later that Thanksgiving morning, Griffin traveled south near Wellington to pick up her daughter from a relative's house.

{¶25} Officer William Flesch of the City of Oberlin Police Department testified that he was patrolling Oberlin Road around 1:30 a.m. on November 26th. He testified that he decided to run the license plate of a dark colored, late model Cadillac through LEADS when he observed it traveling down Oberlin Road. Officer Flesch followed the car for a short period, but never stopped it because he did not detect any infractions. He never saw the driver, but remembered watching the car turn eastbound onto Parsons Road before he drove away. Officer Flesch could not recall the license plate number of the car, but Officer Russell Scarbrough, a supervisor in the Communications Center of the Lorain County Sheriff's Office, confirmed the LEADS check that Officer Flesch had performed. The check took place at 1:31 a.m. on November 26th and the checked plate number matched the plate number of Griffin's Cadillac.

{¶26} Several members of the Bureau of Criminal Identification and Investigation ("BCI") tested various items that were taken from Griffin's car and his apartment. Christopher Smith, a forensic scientist in the DNA and Forensic Biology Section, testified that he performed a DNA analysis on the glove taken from Griffin's car. He confirmed that DNA he found inside the glove was consistent with Griffin's DNA. Smith also tested a jacket taken from Griffin's apartment and confirmed that the DNA profile he obtained from the jacket was consistent with Griffin's. Martin Lewis, a forensic scientist in the trace evidence section, testified that he performed gunshot residue testing on the glove, the jacket, and several swabs taken from Griffin's car. Lewis testified that he found particles highly indicative of gunshot residue on the glove. He further found particles highly indicative of gunshot primer residue on the left cuff of Griffin's jacket, the steering wheel of his car, and the back of the front passenger seat of his car.

{¶27} In addition to performing gunshot residue testing, Lewis was asked to examine the very small piece of metal that Detective Kovacs discovered on the front passenger floor mat of Griffin's car. Specifically, Lewis compared the piece of metal to the zipper teeth of the jacket Cookie was wearing when he was shot. As previously discussed, the coroner observed that one of the gunshots inflicted upon Cookie struck the zipper portion of his jacket and dislodged some of its teeth. Lewis opined that the small piece of metal he examined was the same color, shape, and size as the zipper teeth on Cookie's jacket. He also performed an infrared analysis and determined that both the small piece of metal and the zipper teeth exhibited the same chemical properties.

{¶28} The police never recovered the firearm used to shoot Cookie. They also never found any bullet casings at the scene. Michael Roberts, a forensic scientist from BCI's Firearms Department, noted, however, that unlike the bullet casings ejected from a semi-automatic

weapon, bullet casings will remain in a revolver until manually removed from its chambers. As previously discussed, one of the tenants of Griffin's apartment testified that he had pointed a revolver at her the day before Cookie's murder, when questioning her about a break in.

{¶29} The only witness presented by the defense was Amanda Varney, a resident of Jones Road in Wellington. Varney testified that Jones Road is located within 1.5 miles of Pratt Road, the road on which Cookie's body was found. Varney testified that she was routinely awake during the night for short periods of time around Thanksgiving 2009 because she was pregnant and was not sleeping well. According to Varney, she distinctly heard three gunshots fired at about 2:15 a.m. on Thanksgiving Day (November 26th). At that time, Griffin's cell phone records showed that his cell phone was no longer in the area. Varney admitted, however, that it was quite common to hear gunshots in the area. Larry Eishan, the man who discovered Cookie's body on Pratt Road, also testified that there were frequent gunshots in the rural area.

{¶30} Having reviewed the entire record, we cannot conclude that Griffin's convictions are against the manifest weight of the evidence. Griffin was specifically looking for Cookie on the night of November 25th; the same night that he was carrying a revolver around questioning tenants about the break in at his apartment. Griffin's cell phone number was the last one dialed on Cookie's cell phone, and a resident of the apartment building saw Cookie go into Griffin's apartment just after 1:00 a.m. on the morning of November 26th. Griffin lied to the police about his whereabouts around the time Cookie was murdered. Although Griffin denied having gone anywhere, he was not present at the apartment when Ewing awoke. Moreover, his Cadillac was spotted at 1:30 a.m. not far from the murder scene, and his cell phone was within the range of the cell tower encompassing the murder scene at 1:47 a.m. Later the same morning, the cell phone

again traveled south near Wellington when Griffin went to pick up Ewing's daughter. Ewing confirmed that the cell phone number at issue was Griffin's.

{¶31} Gunshot residue testing uncovered gunshot residue on Griffin's glove as well as primer residue on the cuff of his jacket and the inside of his car. The car also contained pieces of grass that resembled the loose grass at the murder scene and a very small piece of metal that was the same color, size, and shape and had the same chemical composition as the zipper teeth from Cookie's jacket. Although the murder weapon was never found, the use of a revolver would have explained the lack of bullet casings at the crime scene. Moreover, the police never found the revolver that Griffin pointed at Aubry Brown on November 25th.

{¶32} Although the State's case against Griffin was circumstantial in nature, circumstantial evidence "inherently possess[es] the same probative value" as direct evidence. *State v. Jones*, 9th Dist. No. 25986, 2012-Ohio-4256, ¶ 9, quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph one of the syllabus. Based on our review of the record, this is not the exceptional case where the trier of fact lost its way by convicting Griffin. *See Thompkins*, 78 Ohio St.3d at 387. Therefore, his second assignment of error is overruled.

Assignment of Error Number One

THE PROSECUTOR COMMITTED MISCONDUCT WHEN MR. GRIFFIN'S EXERCISE OF HIS CONSTITUTIONAL RIGHTS WAS USED AGAINST HIM AT TRIAL.

{¶33} In his first assignment of error, Griffin argues that he was denied his right to a fair trial because the prosecutor engaged in misconduct throughout the trial. Specifically, he argues that he was penalized for asserting his constitutional rights because the prosecutor repeatedly referenced his refusal to submit to gunshot residue testing and his desire to consult with counsel after the police contacted him.

**{¶34}** In deciding whether a prosecutor's conduct rises to the level of prosecutorial misconduct, a court determines if the prosecutor's actions were improper, and, if so, whether the defendant's substantial rights were actually prejudiced. *State v. Smith*, 14 Ohio St.3d 13, 14 (1984). "[A] judgment may only be reversed for prosecutorial misconduct when the improper conduct deprives the defendant of a fair trial." *State v. Knight*, 9th Dist. No. 03CA008239, 2004-Ohio-1227, ¶ 6, citing *State v. Carter*, 72 Ohio St.3d 545, 557 (1995). The defendant must show that, but for the prosecutor's misconduct, the jury would not have convicted him. *State v. Lollis*, 9th Dist. No. 24826, 2010-Ohio-4457, ¶ 24. "The touchstone of the analysis 'is the fairness of the trial, not the culpability of the prosecutor.'" *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 140, quoting *Smith v. Phillips*, 455 U.S. 209, 219 (1982).

**{¶35}** The prosecutor noted in both opening and closing that Griffin had refused to allow the police to swab his hands during their investigation. Griffin's refusal also came to light during the testimony of several witnesses, some of whom stated that the reason Griffin refused was that he wanted to consult with an attorney. Additionally, the prosecutor told the jury during opening statements that Griffin had called a lawyer before the police ever contacted him. The statement proved untrue, as the prosecutor later determined that the lead officer's report contained a mistake. Subsequently, the prosecutor corrected the record during the testimony of the lead officer, verifying that Griffin only contacted a lawyer after the police contacted him.

**{¶36}** Griffin argues that it was improper for the prosecutor to draw attention to either his refusal to allow the police to swab his hands or to his desire to consult with an attorney at any point in time. Because he had a constitutional right to refuse a swab and to consult with a lawyer, Griffin argues, it was inappropriate for the prosecutor to comment on the fact that he had asserted his rights. *See State v. Wiles*, 59 Ohio St.3d 71, 88 (1991). Griffin avers that the

prosecutor's actions amounted to misconduct because the repeated references to his having asserted his rights created an inference that he had something to hide or that he would not have asserted his rights if he were innocent.

{¶37} The record reflects that Griffin did not object to any of the statements by the prosecutor that he now argues were improper. He also never otherwise brought the issue to the attention of the trial court (e.g., by seeking a mistrial). "[W]hen the defendant fails to object to [] purported acts of prosecutorial misconduct, he limits appellate review to that of plain error." *State v. Veal*, 9th Dist. No. 26005, 2012-Ohio-3555, ¶ 18. Yet, this Court has refused to review a prosecutorial misconduct argument for plain error sua sponte when an appellant has failed to do so. *See, e.g., State v. Hicks*, 9th Dist. No. 24708, 2011-Ohio-2769, ¶28-31, *State v. Ha*, 9th Dist. No. 07CA0089-M, 2009-Ohio-1134, ¶ 61-63. Griffin has not argued plain error on appeal. As detailed in Griffin's manifest weight assignment of error, the State amassed a great deal of evidence from which the jury concluded that Griffin was guilty. Griffin does not address any of the other evidence in the case or explain why, in the absence of the prosecutor's alleged misconduct, the jury would not have convicted him. *See Lollis*, 2010-Ohio-4457, at ¶ 24. *See also Veal* at ¶ 18 (decision will not be reversed for plain error "unless the defendant has established that the outcome of the trial clearly would have been different but for the alleged error"). As this Court has repeatedly held, "[i]f an argument exists that can support [an] assignment of error, it is not this [C]ourt's duty to root it out." *Cardone v. Cardone*, 9th Dist. No. 18349, 1998 WL 224934, *8 (May 6, 1998). Griffin's first assignment of error is overruled.

Assignment of Error Number Four

THE TRIAL COURT ERRED IN FAILING TO PROPERLY INSTRUCT THE JURORS REGARDING THE TESTIMONY OF CO-DEFENDANT RONAYE EWING.

**{¶38}** In his fourth assignment of error, Griffin argues that the trial court failed to properly instruct the jury. Specifically, he argues that the court should have given the jury an accomplice instruction with regard to the testimony of Ronaye Ewing.

**{¶39}** The record reflects that Griffin never objected to the trial court's jury instruction or asked the court to instruct the jury on accomplice testimony. When a defendant does not object to a trial court's failure to give a certain jury instruction, we review the defendant's challenge to that alleged error on appeal for plain error. *See State v. Garner*, 9th Dist. No. 25771, 2012-Ohio-1439, ¶ 20-21. In determining whether the trial court committed plain error by failing to give the jury an accomplice instruction under R.C. 2923.03, this Court generally examines several specific factors. *See State v. Simpson*, 9th Dist. No. 25363, 2011-Ohio-2771, ¶ 19. Here, however, Griffin has not argued plain error. *See State v. Gray*, 9th Dist. No. 08CA0057, 2009-Ohio-3165, ¶ 7 ("[T]his Court will not undertake a plain error analysis sua sponte when the appellant has failed to assert such an argument in his brief."). He also has not explained how Ewing was, in fact, an accomplice.

**{¶40}** Generally, "[a]t minimum, an accomplice must be someone who has been indicted for the crime of complicity." *State v. Smith*, 9th Dist. No. 25650, 2012-Ohio-794, ¶ 22. Otherwise, an accomplice instruction may become necessary only in certain "rare circumstances" where a person might have been an accomplice, but was never indicted, such as a situation in which he or she received immunity in exchange for his or her testimony. *Id.* Ewing testified that she was originally charged with obstructing justice, a third-degree felony, but that the State reduced her charge to obstructing official business, a second-degree misdemeanor, in exchange for a guilty plea and her testimony. Thus, Ewing was indicted, but she was never charged with complicity. She also repeatedly informed the jury that her charges were reduced as a result of

her plea agreement. Apart from failing to argue plain error, Griffin has not shown that Ewing was actually an accomplice or that her status was such that this was one of the "rare circumstances" where an accomplice instruction was warranted. *See id.* This Court will not undertake an analysis on Griffin's behalf when he has not done so. *See Gray* at ¶ 7. Griffin's fourth assignment of error is overruled.

Assignment of Error Number Five

THE TRIAL COUNSEL WAS INEFFECTIVE WHERE COUNSEL FAILED TO BIFURCATE THE SINGLE COUNT OF HAVING A WEAPON UNDER DISABILITY AND INSTEAD ALLOWED THE JURY TO LEARN OF APPELLANT'S PRIOR CRIMINAL HISTORY.

**{¶41}** In his fifth assignment of error, Griffin argues that he received ineffective assistance of trial counsel because his counsel never sought to bifurcate his count of having a weapon under disability from his remaining counts for purposes of trial. We disagree.

**{¶42}** To prove an ineffective assistance claim, Griffin must show two things: (1) that counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, Griffin must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691. Furthermore, this Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Ray*, 9th Dist. No. 22459, 2005-Ohio-4941, ¶ 10.

{¶43} Before the jury was seated, Griffin's attorney asked the court to order the clerk to temporarily seal online access to Griffin's record to prevent anyone from accessing information about Griffin's other convictions or cases during the trial. His counsel also stipulated to the prior conviction relevant to the having weapons under disability charge to prevent the State from calling the victim from the prior conviction in to testify. Nevertheless, Griffin argues that his attorney was ineffective because he did not seek to sever his weapons charge from the trial on his remaining charges. Griffin argues that it was inherently prejudicial for the jury to learn that he had a prior conviction.

{¶44} Griffin has not shown that his counsel's performance was deficient or that there is a reasonable probability that the outcome of his trial would have been different, but for his counsel's performance. "[A]n attorney's decisions not to file certain pretrial motions [,including a motion to sever charges for separate trials,] are 'debatable trial tactics [that] generally do not constitute a deprivation of effective counsel.'" *State v. Aaron*, 9th Dist. No. 21434, 2003-Ohio-5159, ¶ 23, quoting *State v. Phillips*, 74 Ohio St.3d 72, 85 (1995). Moreover, Griffin fails to explain how, in light of all of the other evidence introduced at trial, the result of his trial would have been any different had his weapons under disability count been tried separately. The fact that Griffin's attorney did not seek to bifurcate his weapons under disability count from the remaining counts does not constitute per se ineffective assistance of counsel. Griffin has not satisfied either of the *Strickland* prongs. Consequently, his fifth assignment of error is overruled.

III

{¶45} Griffin's assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed.

Judgment affirmed.

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

BETH WHITMORE
FOR THE COURT

MOORE, P. J.
CARR, J.
CONCUR.

APPEARANCES:

KREIG J. BRUSNAHAN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.