[Cite as *State v. Linder*, 2018-Ohio-3951.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

---

JOURNAL ENTRY AND OPINION
**No. 106600**

---

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**CHARLES E. LINDER, JR.**

DEFENDANT-APPELLANT

---

**JUDGMENT:**
AFFIRMED

---

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-17-615950-A

**BEFORE:**  Jones, J., Eileen A. Gallagher, A..J., and Blackmon, J.

**RELEASED AND JOURNALIZED:**  September 27, 2018

**ATTORNEY FOR APPELLANT**

Joseph V. Pagano
P.O. Box 16869
Rocky River, Ohio 44116


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

BY: Jonathan Block
Assistant County Prosecutor
The Justice Center, 8th Floor
1200 Ontario Street
Cleveland, Ohio 44113


LARRY A. JONES, SR., J.:

{¶1} In this appeal, defendant-appellant Charles Linder, Jr. ("Linder") challenges his

conviction, which was rendered after a jury trial, for several crimes associated with the assault of

Kimyata Luckey ("Luckey"). Linder also challenges the denial of his (1) motion to suppress, (2) motion to dismiss on speedy trial grounds, and (3) request to merge two of the charges for the purpose of sentencing. For the reasons that follow, we affirm.

## I. Procedural History

{¶2} The date of the incident giving rise to this case was March 4, 2017. Linder was arrested on March 31, 2017, and charged by a Cuyahoga County Grand Jury on April 18, 2017. He remained in jail from the date of his arrest through the pendency of the case.

{¶3} As mentioned, the victim was Luckey, and the indictment charged that Linder committed the following crimes against her: Count 1, attempted murder; Counts 2 and 3, felonious assault; and Count 4, kidnapping. Counts 1 through 4 contained one- and three-year firearm specifications. Additionally, Linder was charged in Count 5 with having weapons while under disability. Linder was declared indigent, and the court appointed counsel to represent him.

{¶4} Discovery and pretrial motion practice occurred throughout the spring, summer, and fall of 2017, and included counsel filing a motion to suppress and Linder filing a pro se motion to dismiss on speedy trial grounds, that counsel adopted. A hearing was held on the motions, and both motions were denied.

{¶5} The case then proceeded to a jury trial on all the indicted charges on October 10, 2017. After the state presented its case, the defense made a Crim.R. 29 motion for judgment of acquittal that was denied. Linder testified, and after the defense rested, it renewed its Crim.R. 29 motion that was again denied. The state presented a rebuttal witness. After its deliberations, the jury found Linder guilty on all counts.

{¶6} At sentencing, the court found that the attempted murder charge in Count 1 and the

felonious assault charges in Counts 2 and 3 were allied offenses and merged them; the state elected to proceed to sentencing on the attempted murder charge. The court sentenced Linder to ten years for the attempted murder, plus three years for the firearm specification. The trial court further sentenced Linder to ten years on Count 4, kidnapping, plus three years for the firearm specification, and 36 months for Count 5, having weapons while under disability. All counts (and, over the state's objection, gun specifications) were ordered to be served concurrently. Thus, Linder was sentenced to an aggregate 13-year term.

## II. Facts

### A. Suppression Hearing

{¶7} Linder gave an incriminating statement during his interview with Detective Aaron Reese ("Detective Reese") and sought to suppress it. Specifically, Linder's motion to suppress was based on the following allegations: (1) the statement was taken while Linder was under the influence of PCP; and (2) Linder requested the presence of an attorney. The state presented the testimony of the investigating detective, Detective Reese, at the suppression hearing. Detective Reese testified that he was assigned to this case on March 4, 2017. He reviewed the police report and learned that the victim, who at that time had not been identified, was hospitalized and unconscious after witnesses said she had been shot in the head. The detective identified Linder as the suspect and talked to Linder several times over the phone; the detective urged Linder to come to the police station and talk to him. Eventually, Linder voluntarily came to the police station and Detective Reese interviewed him. The interview was recorded on video, and the video was admitted into evidence.

{¶8} Detective Reese advised Linder of his *Miranda*[1] rights, and Linder indicated that he understood them. Detective Reese testified that Linder never asked for an attorney. Detective Reese asked Linder if he was under the influence of anything, and Linder said he was not. Detective Reese further testified that Linder did not appear to be under the influence of anything and described him as being "calm."

{¶9} The trial court questioned Detective Reese about what the protocol is when he interviews someone who he suspects might be under the influence. The detective answered, "I would stop the interview — * * * certainly it's happened in the past, and it's been used as a defense, so I've learned from that to say that I would stop and [ask the person being interviewed to] come back again later." Detective Reese further stated that PCP, that he knew Linder had previously used, has a "very, very strong odor, and even if someone's smoking it, you could smell it on their clothing." He told the court that there was "no indication that [Linder] was under the influence. [He] certainly didn't smell [or] display any of the behavior [of being under the influence of PCP] that I'm familiar with."

{¶10} After listening to Detective Reese's testimony and watching the video of the interview, the trial court denied Linder's suppression motion. The court noted that there was "no evidence that the defendant was in fact intoxicated at the time." The court further found that the "video clearly shows the detective giving the *Miranda* warnings, which included the right to halt the interview at any time and request an attorney at any time during the course of the interview," and that "no such request by the defendant for an attorney or no such request to stop the interview" was ever made.

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

**B. Trial Testimony**

{¶11} On the day in question, the victim, Luckey, was at her friend, Erica Caryle's ("Caryle") apartment that was owned by the Cuyahoga Metropolitan Housing Authority ("CMHA"). Linder came to the residence and went to sleep.

{¶12} Luckey testified that after Linder went to sleep, Caryle decided to steal PCP from him. Luckey told Caryle she wanted nothing to do with the plan; Caryle, however, stole the drugs from Linder. Luckey testified that Caryle acted on her own.

{¶13} A few minutes later, Linder woke up and confronted the women about his missing drugs; both denied knowing anything about it. Luckey testified that Linder then attacked her, first punching her several times on the head, followed by beating her in the head with a pistol. After several blows to the head, Luckey fell unconscious — the last thing she remembered was being inside the apartment. Her next memory was 15 days later, when she woke up in a hospital.

{¶14} The state presented the testimony of another resident from the CMHA complex, Mariah Montanez ("Montanez"), to help fill in the gaps. Montanez, a resident on the first-floor, testified that she came out of her apartment after hearing loud noises from the hallway. She heard a woman yelling "get off of me," and a man responding, "you should have never stole from me." Although Montanez initially testified that she did not see the man, she later admitted that she did see him, and it was Linder. Montanez testified that she saw Linder shaking the woman, and then drop her, head first, from the second floor to the first floor. There was another woman with Linder, and she was yelling "just take her down, beat her ass, kill her." Montanez called the police and was interviewed by them on the scene when they arrived.

{¶15} Both Cleveland and CMHA police responded to the scene. The officers testified

to finding Luckey unconscious, bleeding from her head and nose in the complex's courtyard. One of the officers found a spent shell casing next to her head. The officer also found a blood trail that led from inside the stairwell to the third floor. Luckey was transported to the hospital by ambulance; her identity, however, was initially unknown.

{¶16} The emergency room physician who treated Luckey testified. Luckey arrived at the hospital unresponsive and was labeled as a "category 1" patient, which is the "highest concern level for a patient's care." Her injuries were life threatening. She immediately required resuscitation. She was then placed on a ventilator and put in a medically-induced coma to keep her breathing appropriate.

{¶17} Luckey's mother testified about her recovery after the incident, which involved her having to relearn how to walk and talk, and how it has negatively affected Luckey mentally.

{¶18} Linder's former girlfriend and the mother of two of his children, Tanisha Stone ("Stone"), testified; she was a reluctant witness who appeared pursuant to a bench warrant. According to Stone, she spoke with Linder after the incident and he told her that he "did something bad." Specifically, Linder told her that he was getting high with Luckey and Caryle and his money "came up missing" after he fell asleep. He believed Luckey had it, so he hit her, dragged her down the stairs, and shot off a gun.

{¶19} Detective Reese testified at trial that he went to the CMHA complex to attempt to locate witnesses to the incident. While there, he noticed an apartment with the door open and a television on at a high volume. The detective asked CMHA officials to do a welfare check of the apartment. Reese learned that the apartment had belonged to Caryle, who, at that time, was

jailed on an unrelated matter.[2]   After obtaining consent from Caryle, the detective searched the apartment and saw what he suspected to be blood in it.   He also found an identification card belonging to Luckey, and that was how her identity was discovered, and thereafter, her family was notified.

{¶20} The detective also testified at trial about his interview with Linder.   During the interview, Linder admitted that he was at Caryle's apartment at the time in question and stated that he was just trying to get his money back.   Linder also told the detective that Luckey attacked him.   While outside, an unknown man saw Luckey attacking Linder and came to Linder's aid; the unknown man was the person who beat Luckey.   Linder gave two different possible names for the unknown man.   Linder gave inconsistent statements about who fired a gun — at one juncture saying he did, and at another saying the unknown man did.   Detective Reese admitted that he engaged in tactics such as lying to and leading Linder during the interview.

{¶21} The detective also admitted that Caryle told him that another person was there. Other than Linder's and Caryle's statements that another person was there, Detective Reese could never obtain any other corroborating evidence.   The detective also testified though that he felt like Caryle was "playing games" with him.

{¶22} Detective Reese testified that swabs of blood were taken from the scene, but admitted that they were not tested.   The shell casing removed from where Luckey was found was also not tested.   According to the detective, the testing was not necessary because his investigation demonstrated that Linder was the perpetrator.

---

[2]Caryle was jailed for allegedly attacking her (Caryle's) mother.   The alleged attack occurred at the CMHA complex, but in a different apartment.

{¶23} As mentioned, after the state rested its case and the defense's motion for a Crim.R. 29 judgment of acquittal was denied, Linder testified. According to Linder, he went to Caryle's apartment on the date in question to get high; once there, he and Caryle smoked PCP. He and Caryle were the only two in the apartment at the time. After smoking the drugs, Linder fell asleep.

{¶24} Linder testified that he woke up because Caryle was tapping his leg. As was his custom, Linder checked his pocket for his money and discovered that his wallet, that he had had in his back pocket, was in his front pocket. According to Linder he had cashed his social security check and "got money off his card" prior to going to Caryle's apartment. Upon looking through his wallet, Linder discovered that the approximately $800 he had was gone. He also discovered that his drugs, which he had in another pocket, were missing. Linder asked Caryle where his money was, and she looked at Luckey, who was now at the apartment.

{¶25} Luckey denied having Linder's money, however, and "jumped up" from the chair she was sitting in. When she jumped up, Linder saw what he believed was his money and drugs in her pocket. He "grabbed" his money and drugs out of Luckey's pocket, and Luckey started hitting him. Caryle told them to leave, so Linder walked outside, but Luckey continued to "hold on" to him; he was "trying to get away from her."

{¶26} Once outside, Linder continued to try to "get loose from" Luckey. Eventually, Linder "yanked away from her and she fell." Meanwhile, Caryle was yelling at Luckey that she got what she deserved for stealing from Linder. At the same time, one of Linder's friends, "Joseph," happened on the scene. Upon hearing Caryle's claim that Luckey had stole from Linder, the friend entered the fray and started "beating [Luckey] with his hands" and "stomping" on her. Linder told the man "stop it. Man, I'm cool. I got my money back. You know,

everything cool, leave her alone * * *." Linder denied firing a gun.

{¶27} Linder testified that he then returned to Caryle's apartment to get his belongings. While in the apartment, he saw that the police had arrived and were by Luckey. Upon leaving the apartment, he saw "Joseph" and asked him for a ride. The two walked by the police — one of the officer's was holding Luckey up and her eyes were open — and Linder asked the officer if Luckey was all right, but got no response. So Linder just left the scene.

{¶28} Linder also testified about his interview with Detective Reese. Linder testified that he had to get his "nerve up" to go see the detective so he could tell him who had beat Luckey. On the day he went to see Detective Reese, he was intoxicated and forgot the name of the man ("Joseph") who had done this. Linder testified that he was rattled by the detective from the start: the detective met him in the police station parking lot, and told Linder he remembered him as a former gang member who "baked PCP."

{¶29} Linder testified that another man was in the interview room and he did not know why that man did not appear on the video of the interview. Linder further testified that he asked for an attorney right away, but Detective Reese told him "this is not a video-recorded * * * interrogation."

{¶30} According to Linder, he could not remember much from the interview because he was high. Detective Reese was "putting things in his head and making him believe these things occurred." Linder told the jury that he believed the detective "had something against him."

{¶31} The state called Detective Reese on rebuttal. The detective testified that Linder was not high on PCP at the time of the interview, as he would have been able to smell it even if Linder had taken a shower or put cologne on.

{¶32} Further facts will be discussed as necessary below.

### III.   Assignments of Error

**{¶33}** Linder now raises the following six assignments of error for our review:

I.   Appellant's Sixth and Fourteenth Amendments Rights under the United States Constitution were violated based on ineffective assistance of counsel.

II.   The trial court erred by denying Appellant's motion to suppress statements in violation of his constitutional rights.

III.   The trial court erred when it denied Appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

IV.   Appellant's convictions are against the manifest weight of the evidence.

V.   The trial court erred by failing to merge all allied offenses of similar import and by imposing separate sentences for allied offenses which violated Appellant's state and federal rights to due process and protections against double jeopardy.

VI.   Appellant's federal and state constitutional right to a speedy trial and due process were violated and his conviction should be vacated and dismissed.

### IV.   Law and Analysis

**Ineffective Assistance of Counsel**

**{¶34}** In his first assignment of error, Linder contends that his trial counsel was ineffective.   He bases his claim on his attorney's failure to:   (1) move to have the having weapons while under disability count bifurcated from the other charges and tried to the bench; (2) object to Detective Reese's testimony about his belief that Linder was not under the influence of PCP at the time of the interview and testimony that he had the ability to tell if someone is lying; and (3) subpoena Caryle to testify for the defense.

**{¶35}** The Ohio Supreme Court has repeated the well-established standard for reviewing claims of ineffective assistance of counsel:

> Reversal of convictions for ineffective assistance of counsel requires that the defendant show, first, that counsel's performance was deficient and, second, that

the deficient performance prejudiced the defense so as to deprive the defendant of a fair trial. *Strickland v. Washington* (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674.

*State v. Hanna*, 95 Ohio St.3d 285, 2002-Ohio-2221, 767 N.E.2d 678, ¶ 109.

{¶36} Counsel's performance may be found to be deficient if counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland* at 687; *see also, State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraph two of the syllabus. To prove that counsel's deficient performance prejudiced the defense, a defendant must establish that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland* at *id.*; *Bradley* at paragraph three of the syllabus.

{¶37} Moreover, when a reviewing court considers an ineffective assistance of counsel claim, the reviewing court should not consider what, in hindsight, may have been a more appropriate course of action. *See State v. Phillips*, 74 Ohio St.3d 72, 85, 656 N.E.2d 643 (1995). Rather, the reviewing court "must be highly deferential." *Strickland* at 689. As the *Strickland* court stated, a reviewing court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id.*, quoting *Michel v. Louisiana*, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed.83 (1955).

## A. Failure to Request Bifurcation

{¶38} Linder contends that his trial attorney was ineffective because he failed to bifurcate the having weapons while under disability and have it tried to the bench rather than have the jury consider it along with the other charges.

**{¶39}** This court has held that failure to bifurcate a having weapons while under disability charge can contribute to ineffective assistance of counsel. *See State v. Jenkins*, 8th Dist. Cuyahoga No. 91100, 2009-Ohio-235. But in *Jenkins*, for example, this court found that this failure alone would not constitute ineffective assistance of trial counsel; rather it "add[s] to the cumulative nature of counsel's errors," because it could not "conceivably be considered a trial tactic" under the facts and circumstances of the case. *Id.* at ¶ 17; *see also State v. Thompson*, 8th Dist. Cuyahoga No. 96929, 2012-Ohio-921, ¶ 39-40 (although "troubled by defense counsel's decision not to request that the weapons while under disability charge be bifurcated from the other charges," this court declined to reverse defendant's conviction where the failure to bifurcate the having weapons while under disability charge "did not taint the entirety of the proceedings to the extent that a reasonable probability exists that the outcome of trial would have been different had the charge been separated"); *State v. Griffin*, 9th Dist. Lorain No. 11CA10128, 2013-Ohio-416, ¶ 43-44 (defense counsel's failure to bifurcate having weapons while under disability charge "does not constitute per se ineffective assistance of counsel").

**{¶40}** Upon review, we do not find merit to Linder's ineffective assistance of counsel claim on this ground. Because Linder testified at trial, he opened the door to the jury learning about his criminal record. Moreover, even had he not testified, based on the other evidence presented against him, we do not find that the outcome of the trial would have been different.

**B.   Failure to Object to Testimony**

**{¶41}** Linder next claims that his trial counsel was ineffective by not objecting to portions of Detective Reese's testimony. According to Linder, the detective impermissibly testified that "he had the ability to tell when someone was lying," and that "in his opinion he could be an expert on PCP use."

**{¶42}** It is true that a witness may not express his or her belief or opinion as to the credibility of another witness. *State v. Boston*, 46 Ohio St.3d 108, 128, 545 N.E.2d 1220 (1989). But Detective Reese did not state his opinion or belief as to the veracity of any witness in this case.

**{¶43}** Rather, on direct examination, the assistant prosecuting attorney asked the detective about any specialized training he had received since becoming a detective. The detective answered that he had been to a school that focused on interrogation and interview techniques. The assistant prosecuting attorney questioned the significance of that training for his job, to which Detective Reese responded, "[m]uch of my job as a detective is interacting with people, suspects, witnesses, victims, and so certainly identifying deceptive behavior would be something of great importance to my position."

**{¶44}** The detective defined deceptive behavior as "somebody that's being untruthful is basically what it comes down to. Someone who's showing deception when speaking to the police or speaking in general but somebody's not being truthful." As to the importance of recognizing deceptive behavior, Detective Reese testified that "as a police detective often I'm assigned to investigate a certain criminal offense that occurred, so it's important for me to figure out what happened, who did what, who saw, and so on."

**{¶45}** Thus, the detective did not testify about any witnesses's credibility in this case. There was nothing improper about his testimony.

**{¶46}** Regarding the detective's testimony about PCP, that testimony was elicited when the state called the detective on rebuttal, after Linder testified that he was under the influence of PCP at the time the detective interviewed him. Specifically, Linder testified that Detective Reese had smelled the drug on him.

**{¶47}** In rebuttal, the detective testified that Linder's statement (that he smelled PCP on Linder) was untrue and about his 21 years of police experience and the "hundreds of times" he encountered people under the influence of PCP.

**{¶48}** Rebuttal evidence has been defined as,

> "that which is given to explain, repel, counteract, or disprove facts given in evidence by the adverse party. It is that evidence which has become relevant or important only as an effect of some evidence introduced by the other side. * * *"

> The scope of rebuttal testimony is limited by the evidence adduced by the opposing party.

*Nickey v. Brown*, 7 Ohio App.3d 32, 35, 454 N.E.2d 177 (9th Dist.1982), quoting 31 Corpus Juris Secundum 818, Evidence, Section 2.

**{¶49}** Thus, the purpose of the rebuttal portion of trial is to allow the state to refute evidence offered by the defense. *State v. Moore*, 47 Ohio App.2d 181, 353 N.E.2d 866 (9th Dist.1973). Furthermore, the scope of a witness's rebuttal testimony is left to the discretion of the trial court. *State v. Graven*, 54 Ohio St.2d 114, 115, 374 N.E.2d 1370 (1978); *State v. Bayless*, 48 Ohio St.2d 73, 357 N.E.2d 1035 (1976).

**{¶50}** Upon review, the testimony that Linder complains of was proper rebuttal testimony, presented by the state to rebut Linder's testimony that Detective Reese smelled PCP on him. Thus, counsel was not ineffective for not objecting to it, and the trial court did not abuse its discretion in allowing the testimony.

## C. Failure to Subpoena Caryle

**{¶51}** Linder further claims that his trial counsel was ineffective because he did not subpoena Caryle to testify at trial.

**{¶52}** "Generally, counsel's decision whether to call a witness falls within the rubric of

trial strategy and will not be second-guessed by a reviewing court." *State v. Treesh*, 90 Ohio St.3d 460, 490, 739 N.E.2d 749 (2001), citing *State v. Williams*, 74 Ohio App.3d 686, 600 N.E.2d 298 (8th Dist.1991); *see also State v. Matthews*, 10th Dist. Franklin No. 03AP-140, 2003-Ohio-6307, ¶ 31 (observing that "failure to call a witness is not ineffective assistance if calling that witness opens the door to unfavorable testimony that counsel might reasonably conclude would likely outweigh the value of any favorable testimony the witness might offer").

**{¶53}** Here, Linder fails to show how counsel's decision prejudiced him; he only offers speculation as to how Caryle would have testified. Under such facts and circumstances, we cannot conclude that defense counsel was ineffective because he failed to call Caryle to the stand in Linder's defense.

**{¶54}** In light of the above, the first assignment of error is overruled.

**Denial of Motion to Suppress**

**{¶55}** For his second assignment of error, Linder contends that the trial court erred by denying his motion to suppress. We disagree.

> Appellate review of a motion to suppress presents a mixed question of law and fact. When considering a motion to suppress, the trial court assumes the role of trier of fact and is therefore in the best position to resolve factual questions and evaluate the credibility of witnesses. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. Accepting these facts as true, the appellate court must then independently determine, without deference to the conclusion of the trial court, whether the facts satisfy the applicable legal standard.

(Citations omitted.) *State v. Burnside*, 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, ¶ 8.

**{¶56}** Linder sought to suppress his pretrial statements made during the interview with Detective Reese, contending that they were not voluntarily made.

{¶57} In determining whether a pretrial statement is voluntary, a court "'should consider the totality of the circumstances, including the age, mentality, and prior criminal experience of the accused; the length, intensity, and frequency of interrogation; the existence of physical deprivation or mistreatment; and the existence of threat or inducement.'" *State v. Mason*, 82 Ohio St.3d 144, 154, 694 N.E.2d 932 (1998), quoting *State v. Edwards*, 49 Ohio St.2d 31, 358 N.E.2d 1051 (1976), paragraph two of the syllabus. A defendant's statements to police after a knowing, intelligent, and voluntary waiver of the individual's *Miranda* rights are presumed to be voluntary. *Miranda*, 384 U.S. at 478, 86 S.Ct. 1602, 16 L.Ed.2d 694.

{¶58} According to Linder, the videotape of the interview supports his contention that he was under the influence of PCP at the time. However, a confession made while a person is under the influence of alcohol or drugs does not render the confession inadmissible, although it may affect its weight and credibility. *State v. Thieken*, 3d Dist. Marion No. 9-2000-09, 2000 Ohio App. LEXIS 3048, 9 (June 29, 2000); *Middletown v. Dennis*, 67 Ohio Law Abs. 362, 120 N.E.2d 903 (M.C.1954). There must be some evidence presented that the confession given was obtained as a result of diminished capacity to exercise free will. *State v. Combs*, 62 Ohio St.3d 278, 285, 581 N.E.2d 1071 (1991).

{¶59} Here, the trial court reviewed the videotape of the interview, considered it along with Detective Reese's testimony, and concluded that Linder was not under the influence. Our review of the videotape and suppression testimony supports that same conclusion. Thus, the trial court properly denied Linder's motion to suppress.

{¶60} The second assignment of error is overruled.

**Sufficiency of the Evidence**

{¶61} In his third assignment of error, Linder contends that his conviction was not

supported by sufficient evidence. On review of the sufficiency of the evidence to support a criminal conviction, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

{¶62} Linder contends that his conviction for attempted murder, felonious assault with a deadly weapon, having weapons while under disability, and all the firearm specifications should have been dismissed under Crim.R. 29 because no weapon was recovered and "*most* witnesses did not see a weapon." (Emphasis added.) However, the fact that "most" witnesses did not see a weapon is not dispositive under a sufficiency-of-evidence review. Rather, the issue is whether there was *any* evidence that a weapon was used in this crime, and the answer is "yes." Specifically, Luckey, the victim, testified that Linder had a gun in his hand and used it to hit her in the head. Stone testified that in his "confession" to her, Linder stated that he had and used a gun on the evening in question. Moreover, Linder admitted to Detective Reese as well that he had and used a gun.

{¶63} Linder further claims, in regard to the felonious assault and attempted murder convictions, that the state failed to present sufficient evidence as to his mens rea. According to Linder, all he wanted to do was get his money back from Luckey, who then attacked him. But, again, Luckey testified that Linder hit her in the head with his gun, while she pleaded with him to stop. The evidence presented that a violent and prolonged confrontation occurred, which left Luckey on the verge of death. The evidence was sufficient to sustain the attempted murder and felonious assault convictions.

{¶64} In light of the above, the evidence was sufficient to sustain all of the convictions

and gun specifications. The third assignment of error is therefore overruled.

**Manifest Weight of the Evidence**

{¶65} Linder, in his fourth assignment of error, challenges his convictions as being against the manifest weight of the evidence.

{¶66} A court considering a manifest-weight claim "review[s] the entire record, weighs the evidence and all reasonable inferences, [and] considers the credibility of witnesses." *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983). The question is "whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed." *Id.*; *see also State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

{¶67} Linder contends that the following renders the convictions against the weight of the evidence: (1) lack of testing of the blood swabs to "eliminate any confusion"; (2) Montanez's "nonsensical" testimony; (3) Stone's (Linder's ex-girlfriend) lack of credibility; and (4) Detective Reese's "sloppy" investigation.

{¶68} After having considered Linder's claims, we do not find that the result in this case represents a manifest miscarriage of justice, such that a new trial must be ordered. Most of Linder's claims about the weight of the evidence go to the credibility of the witnesses, which the jury was in the best position to determine. The jury likewise was best able to consider and weigh the investigation that was conducted in this case — we find there was nothing incredible about it. For example, Detective Reese testified that he did not feel the need to test the blood found in Caryle's apartment to determine whether it was blood from Caryle's mother or Luckey because the alleged incident involving the mother occurred in a different location altogether.

{¶69} Several witnesses at trial identified Linder as the perpetrator of the crimes

committed against Luckey. Her injuries as a result of the assault were severe — Luckey, her mother, and the treating emergency room physician testified about them. Further, Linder twice confessed to the crimes — once to Stone (his ex-girlfriend) and once to Detective Reese.

**{¶70}** On this record, the weight of the evidence supports the convictions and the fourth assignment of error is overruled.

**Merger**

**{¶71}** For his fifth assigned error, Linder contends that the trial court erred by not merging Counts 1 and 4 for the purpose of sentencing. We disagree.

**{¶72}** Under R.C. 2941.25(A), "[w]here the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one." However,

> [w]here the defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

R.C. 2941.25(B).

**{¶73}** Two or more offenses are of dissimilar import within the meaning of R.C. 2941.25(B) "when the defendant's conduct constitutes offenses involving separate victims or if the harm that results from each offense is separate and identifiable." *State v. Ruff*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892, paragraph two of the syllabus.

**{¶74}** "At its heart, the allied-offense analysis is dependent upon the facts of a case because R.C. 2941.25 focuses on the defendant's conduct." *Id.* at ¶ 26. In *Ruff*, the Supreme Court held that if a defendant's conduct supports multiple offenses, the defendant can be

convicted of all of the offenses if any one of the following is true: "(1) the conduct constitutes offenses of dissimilar import or significance, (2) the conduct shows the offenses were committed separately, or (3) the conduct shows the offenses were committed with separate animus or motivation." *Id.* at paragraph three of the syllabus, citing R.C. 2941.25(B).

**{¶75}** When determining whether two offenses are allied offenses of similar import, we apply a de novo standard of review. *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶ 28.

**{¶76}** At sentencing, the court found that the attempted murder charge in Count 1 and the felonious assault charges in Counts 2 and 3 were allied offenses and merged them; the state elected to proceed to sentencing on Count 1, attempted murder. The court agreed with the state that Counts 1 and 4, attempted murder and kidnapping, respectively, did not merge.

**{¶77}** Upon review, we find the court's decision was proper. The trial testimony established that Linder's assault on Luckey started inside Caryle's apartment. It ended in the courtyard of Caryle's complex, and a witness, Montanez, a resident at the complex, testified that she saw Linder and Luckey in the hallway of the complex; Linder was shaking Luckey, and then he dropped her, head first, from the second floor to the first floor. Thus, the record demonstrates that the initial assault of Luckey in the apartment was distinct from his kidnaping of her, that is, his purposeful removal of her, by force, from the place where she was found (inside the apartment) for the purpose of terrorizing or inflicting serious physical harm upon her. *See* R.C. 2905.01(A)(3).

**{¶78}** We find no merit to the fifth assignment of error, and overrule it.

**Denial of Motion to Dismiss**

**{¶79}** In his final assignment of error, Linder contends that his speedy trial rights were

violated and, therefore, that the trial court erred in denying his motion to dismiss.

{¶80} Our review of a trial court's decision regarding a motion to dismiss based upon a violation of the speedy trial provisions involves a mixed question of law and fact. *State v. Brown*, 131 Ohio App.3d 387, 391, 722 N.E.2d 594 (4th Dist.1998). An appellate court must give due deference to a trial court's findings of fact if supported by competent, credible evidence, but independently review whether the trial court properly applied the law to the facts of the case. *Id.* When reviewing legal issues presented in a speedy trial claim, we must strictly construe the relevant statutes against the state. *Brecksville v. Cook*, 75 Ohio St.3d 53, 57, 661 N.E.2d 706 (1996).

{¶81} "An accused is guaranteed the constitutional right to a speedy trial pursuant to the Sixth and Fourteenth Amendments of the United States Constitution and Ohio Constitution, Article I, Section 10." *State v. Carmon*, 10th Dist. Franklin No. 11AP-818, 2012-Ohio-1615, ¶ 13. R.C. 2945.71 et seq., Ohio's speedy trial statutes, were implemented to enforce those constitutional guarantees. *Id.*, citing *Brecksville* at 55; *State v. Blackburn*, 118 Ohio St.3d 163, 2008-Ohio-1823, 887 N.E.2d 319, ¶ 10.

**Statutory Speedy Trial Rights**

{¶82} Under R.C. 2945.71(C)(2), the state must bring a defendant arrested on felony charges to trial within 270 days of his or her arrest. If the defendant is held in jail in lieu of bail on the pending charge, as Linder was here, each day counts as three days. R.C. 2945.71(E); *Carmon* at ¶ 14. If an accused is not brought to trial within the speedy trial time limits, upon motion, the court must discharge the defendant. R.C. 2945.73(B); *Carmon* at *id.* A defendant establishes a prima facie case for dismissal based on a speedy trial violation when the defendant demonstrates that more than 270 or 90 days elapsed before trial. *Id.* at ¶ 15 (stating that the

"proper standard of review in speedy trial cases is to simply count the number of days passed, while determining to which party the time is chargeable, as directed in R.C. 2945.71 and 2945.72").

{¶83} "However, the time period in which to bring a defendant to trial may be extended for any of the reasons enumerated in R.C. 2945.72." *Id.* at ¶ 14. For example, R.C. 2945.72(E) provides that the speedy trial time may be tolled by "[a]ny period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused." The extensions or tolling relevant to this case will be detailed below.

{¶84} The statutory time for speedy trial purposes begins to run on the day after the date of the arrest. *State v. Olverson*, 10th Dist. Franklin No. 02AP-554, 2003-Ohio-1274, ¶ 35, citing *State v. Stamps*, 127 Ohio App.3d 219, 223, 712 N.E.2d 762 (1st Dist.1998). Linder was arrested on March 31, 2017; his statutory speedy rights began to run therefore on April 1, 2017.

{¶85} From April 1 through April 21, 2017, **21 days ran**. On April 22, 2017, Linder filed a demand for discovery. "A demand for discovery * * * is a tolling event pursuant to R.C. 2945.72(E)." *State v. Brown*, 98 Ohio St.3d 121, 2002-Ohio-7040, 781 N.E.2d 159, syllabus. The state responded to the demand on April 26, 2017, thereafter lifting the toll.

{¶86} The toll was lifted from April 27, 2017, through May 14, 2017, at which time Linder filed a motion for a bond reduction. Thus, from April 27, through May 14, 2017, **18 days ran**. The time was tolled from May 15, 2007, through May 17, 2017, the date on which the trial court denied Linder's motion for bail reduction. Time started running again on May 18, 2017, and ran until May 24, 2017, at which time the defense requested a competency evaluation; thus, **7 days ran**.

{¶87} The state calculates time being tolled for the competency evaluation from May 24,

2017, through June 23, 2017, but does not indicate what occurred on June 23, and neither the docket nor our independent review of the record demonstrates the significance of June 23, 2017. But elsewhere in the record (i.e., the transcripts), it is indicated that the psychiatric clinic issued its report on May 31, 2017,[3] finding Linder competent. Because we are required to construe any issues that arise in calculating time against the state, we will use the May 31st date. *See State v. Rieves-Bey*, 8th Dist. Cuyahoga Nos. 70827 and 70828, 1997 Ohio App. LEXIS (Oct. 23, 1997), 12 (time is tolled during period which the accused is incompetent to stand trial or his mental competence to stand trial is being determined). So beginning on June 1, 2017, the speedy trial time started running again. From June 1, 2017, through the next tolling date of July 5, 2017, **35 days ran**.

{¶88} On July 5, 2017, Linder filed a motion to continue, which the court granted; it reset the pretrial for July 18, 2017, and trial for August 9, 2017. The time was tolled during this period of time. On the rescheduled August 9 trial date, the court was unavailable, a tolling event under R.C. 2945.72(H) as a "reasonable continuance granted other than upon the accused's own motion[.]" *See State v. Brown*, 7th Dist. Mahoning No. 03-MA-32, 2005-Ohio-2939, ¶ 43. The court rescheduled the trial for September 11, 2017.

{¶89} From July 5, until the October 10, 2017 trial date, the time was tolled because of the following: (1) on September 6, 2017, days before the rescheduled trial date of September 11, 2017, Linder filed a motion to continue, which the court granted and reset trial for October 2, 2017; (2) on September 28, 2017, Linder filed the motion to suppress; and (3) on October 3, 2017, he filed the motion to dismiss. The motions to suppress and dismiss were considered and

---

[3] *See* transcript, page 29.

denied on the day of the start of trial, October 10, 2017.

{¶90} In light of the above, our calculation is that **81 days** counted against the state for the purpose of speedy trial. We note that our calculation differs from the state's calculation, which is a "possible" 57 or 58 days, and that the discrepancy is due, in large part, as to the accounting relative to the tolling period for the competency evaluation; but under either calculation, Linder was brought to time within the statutory constraints for speedy trial.

**Constitutional Speedy Trial Rights**

{¶91} Linder also summarily asserts that the state also violated his constitutional speedy trial rights, which we briefly consider. In *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the United States Supreme Court set forth four factors to consider when evaluating whether an appellant's right to a speedy trial was violated: (1) whether the delay before trial was uncommonly long, (2) whether the government or the defendant is more to blame for the delay, (3) whether the defendant asserted his right to a speedy trial, and (4) whether he suffered prejudice as a result of the delay. *See also State v. Selvage*, 80 Ohio St.3d 465, 467, 687 N.E.2d 433 (1997) (adopting the *Barker* four-part test). These factors are balanced in a totality of the circumstances setting with no one factor controlling. *Barker* at 530.

{¶92} After balancing the *Barker* factors, we conclude that under the particular facts of this case, Linder was not deprived of his right to a speedy trial as guaranteed under the Sixth and Fourteenth Amendments to the United States Constitution. Linder was arrested in March 2017, and his case went to trial in October 2017.

{¶93} In the interim, Linder filed several motions, including motions for discovery and bond reduction. He also filed a request for a competency evaluation. Additionally, he filed

two motions to continue,[4] a motion to suppress, and a motion to dismiss, both of which were filed after the trial court had already granted his two requests to continue the trial. Further, Linder has neither alleged nor demonstrated that he suffered any prejudice because of the delay.

**{¶94}** Because Linder has failed to establish that either his statutory or constitutional speedy trial rights were violated, his sixth assignment of error is overruled.

**{¶95}** Having found no merit to any of the assigned errors, the judgment of the trial court is affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., JUDGE

_____

[4]As mentioned, one other continuance was had because of the trial court's unavailability. The state did not seek any continuances.

EILEEN A. GALLAGHER, A.J., and
PATRICIA ANN BLACKMON, J., CONCUR